43  351
76  571

THE STATE OF CONNECTICUT vs. THE NEW HAVEN & NORTH-
AMPTON COMPANY.

A railroad company abandoned a station on its road, upon application to and approval by the railroad commissioners, who were authorized upon a hearing to grant such permission. The legislature afterwards passed an act requiring the railroad company to stop its trains at the station. A general statute provided that when any amendment of the charter of a corporation should be made, if not otherwise specially provided in the resolution making the amendment, it should not become operative unless accepted by the corporation within six months at a meeting called for the purpose. The charter in question contained a provision that the General Assembly might alter or repeal it at its pleasure. Upon a mandamus to compel the railroad company to stop its trains at the station in question, it was held that the act was operative without acceptance by the railroad company.

Acts like the one stated may be referred to the superintending or supervisory

power of the legislature over the corporations which it has created, and are not strictly amendments of their charters.

There may however be amendments of such a character that an acceptance by the corporation, even without a provision to that effect, is not necessary to their validity.

The railroad commissioners granted permission to discontinue the station when the railroad company should have complied with certain conditions, one of which was the establishment of a new station and the erection of a proper building at a place designated in the order. Held that this action of the commissioners and the establishment of the new station by the railroad company under the order, did not constitute a contract between the state and the railroad company; and that the act of the legislature was not void as impairing the obligation of a contract.

And held that the commissioners were not a judicial tribunal and their decision a judgment in the sense in which those terms are ordinarily used; and that the act therefore was not void as an attempt to annul or reverse a judgment of a judicial tribunal.

The act requiring the railroad company to stop its trains at the station in question, was passed upon the application of the inhabitants of a village within which the station was situated, and provided that, if within six months after the passage of the act, the petitioners and others acting with them should erect at the place in question a station house, and convey the same, with the land on which it should stand, to the railroad company, it should thereupon become the duty of the company to stop its trains at the station, and it was ordered so to do. Held that the act was not void as delegating legislative power to individuals.

APPLICATION for a mandamus, to compel the respondents, a railroad corporation, to resume the use of a station upon their railroad which had been abandoned, and to stop their trains at the same; brought by the Attorney for the State for Hartford County to the Superior Court in that county.

The Attorney averred in the application that the respondents were authorized by their charter, which was granted by the General Assembly in 1846, to construct and operate a railroad from New Haven in this state northerly to the town of Farmington in this state, through the town of Southington, with a provision in the charter that it might be amended, altered or repealed at the pleasure of the General Assembly; that the respondents did immediately thereafter so construct their road, and since the year 1848 have operated the same through said town of Southington; that in 1848 they established a passenger and freight station at the village of Plantsville in Southington, known as the Plantsville station, which

they had continued to use from that time down to May, 1874, when they discontinued and abandoned the same; that afterwards, upon the petition of Orson W. Stow and others, residents of Plantsville, the General Assembly, at its session in May, 1875, passed an act, entitled "An act establishing a depot at Plantsville," in which it was enacted as follows: " That if at any time within six months after the passage of this act, any of the petitioners and others who may act with them for that purpose, shall erect at Plantsville, contiguous to the railroad, a depot building, and convey the same with the land on which it is situated, and the land reasonably necessary for the approaches thereto by the railroad trains, to the New Haven & Northampton Company, to be used for railroad purposes, it shall thereupon become the duty of said company, and it is hereby ordered, to stop at such depot thereafter its regular passenger and freight trains passing over said railroad, for the purpose of receiving and discharging passengers and freight. And all the provisions of the revised statutes applicable to railroad depots and stations, shall be applicable to said depot in the same manner as though said depot had been erected and established by said company. Said order may be enforced by mandamus, by the Attorney for the State for the county of Hartford, or at the relation of any inhabitant of the town of Southington in said county, and the charter of the New Haven & Northampton Company is hereby amended according to the provisions of this act."

The application then proceeded as follows:

And the said Attorney avers that afterwards, and within six months after the passage of said act, Orson W. Stow, one of said petitioners, and Henry D. Smith, Edward W. Twichell, George F. Smith, and Enos E. Stow, others who acted with said Orson W. Stow for the purpose specified in said act, did erect at said Plantsville, contiguous to the railroad, a depot building, at an expense of ten thousand dollars, and that said Orson W. Stow and said others herein mentioned as acting with him, within six months after the passage of said act, to wit, on the 2d day of December, 1875, by a warrantee deed, containing the usual covenants of seizin and clear title, duly

executed and acknowledged, did convey said depot building, with the land on which it is situated, and the land reasonably necessary for the approaches thereto by the railroad trains, to said New Haven & Northampton Company, to be used for railroad purposes, as by said deed ready in court to be shown appears.

And said Attorney further avers that said depot building is amply sufficient and convenient for purposes of a depot and station, and that said land so conveyed as aforesaid is amply sufficient for the convenient use of said depot building as a station and depot, and for the approaches thereto by the railroad trains of said corporation, and that the title to said land, at the time of said conveyance, was vested in the said grantors above mentioned, and was free from all incumbrances.

And said Attorney further avers that afterwards, and within six months after the passage of said act, to wit, on the 7th day of December, 1875, said Orson W. Stow, and others herein named as acting with him, the grantors in said deed of conveyance, did deliver said deed to said corporation, and did leave the same with Charles N. Yeamans, the president of said corporation, at the office of said corporation at said New Haven, and then and there did deliver to said president and leave with him the keys to said depot building, and did then and there offer to said president to do any and every other act and thing they might be lawfully bound to do to carry out the provisions of said act.

And said Attorney further avers that from said 7th day of December, 1875, hitherto, said corporation has retained possession of said deed and keys so delivered as aforesaid, and has notified said Orson W. Stow and others that said deed and keys are held by said corporation subject to their order, and that said corporation has not asked nor required of said Orson W. Stow and others the performance of any other act or thing on their part to be performed, in order to vest in said corporation the title and possession of said depot building and land in accordance with the provisions in said act contained.

And said Attorney further avers that the said Orson W. Stow and others have done and performed all and every act and thing necessary to be done and performed, in accordance with the provisions of said act, and therein mentioned as necessary to be done, before it shall become the duty of said corporation to stop at said depot its regular passenger and freight trains passing over said railroad, for the purpose of receiving and discharging passengers and freight; and that by reason thereof and by virtue of said law, the said depot-building on said 7th day of December, 1875, became, and ever since has continued to be, and now is, a legally established depot and station on the railroad of said corporation, and subject to the provisions contained in the General Statutes applicable to railroad depots and stations.

And said Attorney further avers that from said seventh day of December, 1875, hitherto, said corporation has neglected and refused, and now does neglect and refuse, to stop at said depot its regular passenger and freight trains passing over said railroad; and that on the 8th day of December, 1875, said corporation abandoned said station, and ever since said 8th day of December, 1875, has abandoned the same, and has refused to stop its trains, running over said road, at said station, to the great discomfort, annoyance and inconvenience of the public.

Wherefore the said Attorney moves this honorable court to issue a writ of mandamus, requiring and enjoining the said corporation to discontinue its abandonment of said station, and to stop at said depot hereafter its regular passenger and freight trains passing over said railroad, for the purpose of receiving and discharging passengers and freight; or to signify cause to the contrary thereof to this court.

The court upon this application issued an alternative mandamus, requiring the respondents to stop their regular trains at the station in question, or to show cause to the contrary.

The return filed by the respondents, after admitting their incorporation and the construction and operation of their road, as alleged in the application, proceeded as follows:

And the respondents aver that said corporation, in the year

1848, established three depots or stations on the line of said railroad in said town of Southington, through which said railroad runs for a distance of about three miles, and that one of said stations was located in said village of Plantsville; that on the 18th day of December, 1872, the respondents purchased a piece of land on the line of said road, between the then Southington and Plantsville stations, for the purpose of erecting, and did erect thereon a freight depot, the said land and depot and appurtenances costing about the sum of fifteen thousand dollars; that afterwards, on the twenty-fourth day of November, 1873, said corporation applied to the general railroad commissioners of this state to have the number of stations in said town of Southington reduced to two, by the discontinuance of the said Plantsville station, so called, or the Southington station, so called, or both of them, and if both of them should be discontinued, to have one other depot or station so located as to best promote the common good of all the parties in interest; that in pursuance of said application said commissioners, after legal notice to all parties in interest, and after full hearing given, on the third day of February, 1874, passed an order for the discontinuance of both said stations at Plantsville and Southington, so called, as then located, upon condition that said company should provide and erect a passenger station-house near the new freight depot, as shown on the map exhibited and submitted to them, and after and in compliance with the plans and profiles also submitted for a passenger station building, and should provide suitable and convenient approaches thereto, and suitable and convenient and easy approaches to its new freight depot, to the acceptance of said commissioners; and upon the further condition that said corporation should continue the then freighting facilities to all its patrons; that on the fifth day of November, 1874, said commissioners found, and duly certified that said conditions so annexed to said order of February 3d, 1874, as aforesaid, had been fully and satisfactorily complied with, as by the proceedings before said commissioners hereto annexed will fully appear, which acts of the commissioners were based solely upon the general

statute laws of this state in force at the time of their said action; that after the passage of said order by said commissioners, said corporation proceeded to provide and erect a passenger station near its said new freight depot, as shown on said map, and to provide suitable and convenient approaches thereto, as required by said commissioners in their said order for the discontinuance and abandonment of said stations at said Plantsville and Southington; that in the purchase of land for and erection of said passenger house and appurtenances, and said approaches, it expended the sum of ten thousand dollars; that said large sum of money was expended in reliance upon the legal effect of the decision, judgment and order of said commissioners; and that in like reliance on said judgment and order, and the force thereof, upon completion of said new passenger station and approaches, the old stations at said Plantsville and Southington were discontinued and abandoned, and the buildings forming the same taken away, with the full consent and approval of said commissioners; and that by reason of the premises said stations at Plantsville and Southington became and were in all respects legally and in fact discontinued and abandoned, and said new station became, and was, and now is, in all respects, duly and legally established and located.

And the respondents further aver that there has been no change of facts or circumstances touching said Plantsville station, or the public convenience or necessity therefor, since said order and decision of said commissioners.

And the respondents further admit that afterwards the General Assembly, upon the petition of Orson W. Stow, and others, of said Plantsville, by a certain act passed at its May session, 1875, did enact as follows, to wit: [The same act that is set out in the application, *ante* p. 353.]

And the respondents further admit that the said Orson W. Stow, one of said petitioners named in said act, with others who acted with him for the purpose specified in said act, did erect at said Plantsville, contiguous to the railroad, a depot building, located upon the site of said discontinued depot and about three-quarters of a mile from the new depot building

so built as aforesaid by the respondents; but they deny that the said Orson W. Stow and said others mentioned in said application for mandamus as acting with him, did within six months or at any other time after the passage of said act, convey said depot building with the land on which it is situated to said New Haven & Northampton Company, in any other manner except as is hereinafter stated, to wit, that on or about the seventh day of December, 1875, the said Orson W. Stow and others did tender to said corporation, and to Charles N. Yeamans, the president thereof, at the office of said corporation, a deed of said depot building and of the land on which the same was located, together with the keys of said depot building, which said deed and said keys the said corporation and the said Charles N. Yeamans, its president, did refuse to accept, and did then and there notify the said Orson W. Stow, who insisted upon leaving the same in said office, that both said deed and said keys would remain subject to his order and the order of those acting with him as aforesaid, and the same have ever since remained and now are subject to the order of the said Orson W. Stow and others as aforesaid.

. And the respondents deny that by virtue of said act and by reason of said doings of said Orson W. Stow and others, under the same, the said depot building at Plantsville became on the said seventh day of December 1875, and ever since has continued to be, or now is, a legally established station and depot on the railroad of said corporation, and subject to the provisions contained in the General Statutes applicable to railroad stations and depots.

. And the respondents further aver that said act of the General Assembly passed at its May session 1875, is in violation of the constitution of this state and against law, and is inoperative and void; and they further aver that by a public law of the state of Connecticut, passed by the General Assembly at its May session, 1845, which law has ever since remained, and now is, unrepealed and in full force and effect, it was and is, enacted, in section four of chapter first of title seventeen relating to " private corporations," as follows:

" When any amendment or alteration of the charter of any corporation shall be made, if it be not otherwise specially provided in the resolution making such alteration or amendment, it shall not become operative unless within six months after its passage it shall be accepted at a meeting of said corporation legally warned for that purpose, and unless a copy of such acceptance shall be lodged on file in the office of the secretary of this state, to be recorded by him in a book kept for that purpose; and such acceptance shall operate to make the original charter, and all resolutions amending and altering the same, subject to amendment, alteration and repeal at the pleasure of the General Assembly." And they further aver that said act has never been accepted by said corporation as an amendment to its charter, but on the contrary was at a legal meeting duly warned and held for the purpose of taking action in reference to the acceptance or rejection of said act, expressly and by a unanimous vote rejected by said corporation; by reason whereof, and for the other reasons herein mentioned, said resolution is not and never has been legally an amendment to its charter, or in any manner a part thereof, and is not and never has been binding on it, or of any binding or operative force whatever against it, or in favor of these applicants or of any other person or persons, either as amendment of its charter or as law of this state; and they further aver that said act is in violation of the constitution of the United States, and of the tenth section of the first article thereof, as it is a law which impairs the obligation of the contract between the State of Connecticut and said corporation under its aforesaid charter, and under the law of the land as it existed when said charter was granted, and as it has ever since existed and now remains; and also impairs the obligation of the contract between said State and said corporation arising out of the facts herein set forth relative to the abandonment and erection of said stations. And they further aver that said act is also in violation of the constitution of the United States and of the fourteenth article thereof, because it undertakes to abridge the immunities of said corporation, and to deprive it of its property

without due process of law, and denies to the said corporation, being within the jurisdiction of said state, the equal protection of the laws of said state, and is therefore null and void.

Wherefore for each and all of the causes and reasons in this their return set forth, the respondents insist that said writ of peremptory mandamus should not issue as prayed for in said application, and they pray the judgment of the court thereon, and that they may be hence dismissed.

To this return the Attorney for the State demurred, and the case was reserved upon the demurrer for the advice of this court.

*W. Hamersley*, State's Attorney, and *J. R. Buck*, in support of the demurrer.

1. The first question raised by the return involves the construction of the act of 1845, which provides for the acceptance of amendments granted to chartered companies. The respondents claim that the act can not be operative until accepted by a majority of the stockholders of the New Haven & Northampton Company. But the act manifestly applies only to such amendments as are asked for by the corporation, and which confer a benefit or privilege, and not to such as impose a duty. The act is a plain mandate to the respondents, and it is absurd to say that the corporation can accept or reject the order of the General Assembly. The legislature never intended by the act of 1845 to delegate such powers to stockholders—the power of vetoing its own acts—and thus allow chartered corporations to defeat all such legislation as displeased them. Why should the act be *enforced* by mandamus, if the legislature did not intend that it should become a law irrespective of the acceptance by the stockholders? *Bishop* v. *Brainerd*, 28 Conn., 289; *Society for Savings* v. *City of New London*, 29 id., 174.

2. Does the act violate any contract contained in the charter? That the charter of a private corporation is a contract, is no longer doubtful. *Dartmouth College* v. *Woodward*, 4 Wheat., 518. The respondents aver, in their return, that

"it is a law which impairs the obligation of a contract between the state of Connecticut and said corporation, *under its charter.*" But in the case of *English* v. *New Haven & Northampton Co.*, 32 Conn., 240, the court say: "The grant to the defendants contains an express reservation of the right to alter, amend or repeal at the pleasure of the General Assembly, and whatever might be true if the charter was a close one, the General Assembly could impose upon the defendants *any additional condition or burthen,* connected with the grant, which they might deem necessary for the protection or welfare of the public, and which they might originally, and with justice, have imposed." The restoration of an abandoned station by legislative enactment is within the reserved power to amend, alter or repeal, because it is an additional burthen which the legislature might have originally imposed. In the case of *Commonwealth* v. *Fayette County R. R. Co.*, 55 Penn. S. R., 452, this reserved power was construed, and the court say: "In order to preserve state control over acts of incorporation, the power to repeal, alter, or amend, has been sometimes reserved in the constitution, or in general laws on the subject, or in special acts of incorporation, and whenever it is so reserved its exercise does not impair the contract of which it forms a constituent part." See also *Hyatt* v. *McMahon*, 25 Barb., 457; *Fitchburg R. R. Co.* v. *Grand Junction R. R. Co.*, 4 Allen, 198; *Pennsylvania College Cases*, 13 Wall., 213; *Miller* v. *The State*, 15 id., 488; *Olcott* v. *Supervisors of Fond du Lac*, 16 id., 694; *Commissioners* v. *Holyoke Water Power Co.*, 104 Mass., 446; *Sherman* v. *Smith*, 1 Black, 593; *People* v. *Hills*, 46 Barb., 348; *State, Jersey City & Bergen R. R. Co.* v. *Mayor &c. of Jersey City*, 31 N. Jersey Law R., 580.

3. The respondents further claim, that the act in question impairs the obligation of the contract growing out of the proceedings of the commissioners in authorizing the abandonment of the station and in the establishment by the respondents of a new station under the direction of the commissioners. But it was optional with the respondents whether to abandon or retain the station, after the approval of the commissioners. They could do either, and they chose to abandon.

The power to abandon stations is the same before as after the law of 1866. This power was a part of their franchise, and it has never been taken from them. The act of 1866 only regulates the manner of using it. Their act was purely voluntary, and they so understood it, since the record shows that they expended large sums of money in the purchase of land, and in the erection of a freight-house, before the commissioners were called out. This money must have been expended with a view to the final establishment of a new station at the same point. There is therefore no contract growing out of the action of the railroad commissioners, the obligations of which have been impaired. This power of amendment has been frequently exercised to compel railroad corporations to assume additional burthens for the accommodation of the public. *Commonwealth* v. *Eastern R. R. Co.,* 103 Mass., 254; *Mayor &c. of Worcester* v. *Norwich & Worcester R. R. Co.,* 109 id., 103; *Attorney General* v. *Railroad Companies,* 35 Wis., 425.

4. It cannot be said that the act in question violates the provisions of the 14th article of the amendments of the constitution of the United States. The immunities of the citizens of this state and of the respondents are not abridged thereby. The act simply controls the action of the respondents in exercising the privilege granted by its charter to locate and abandon stations. This privilege is in no sense one of those "immunities and privileges" which the constitution has exempted from legislative powers. We have already shown that the right to control the exercise of this privilege was expressly reserved to the legislature by the terms of the respondents' charter. *Slaughter House Cases,* 16 Wall., 36. Nor does the act deprive the respondents of their property without due process of law, since it is in accordance with the law of their own charter. It affects no property except their franchise, which the legislature has power to regulate in the manner proposed, both by the law of the land and the terms of the charter. Cooley's Const. Lim., 382, 384. Nor is it a delegation of legislative power to the persons in Plantsville upon whose action the duty of the respondents

was to come into existence.  Those persons were not to legislate on the matter, but, if they were to receive the benefit sought, were first to do certain acts, and until those acts were done the respondents were not bound to stop their trains at Plantsville.  It was merely a condition precedent of the duty of the respondents.

*R. D. Hubbard* and *C. E. Perkins,* contra.

It is claimed on the part of the state that all the powers of the respondents arise under their charter; that the state has a reserved power to alter, amend or repeal that charter, and that, in fact, it has so altered it by this act.  We do not deny that the state has the right, in a legal way, to alter or amend the charter of the corporation, but we say that it has, in fact, never done so; that if it has, such reserved power does not enable the state to affect a valid contract between it and the corporation, made *outside* of its charter; and that for other reasons the act is invalid.

1.   It is clear, on all the authorities, that the seventh section of the charter, providing that the company shall "have power to regulate the time and manner in which goods and passengers shall be transported," and erect and maintain stations as they may deem suitable for their interest, constitutes a contract between the state and the company, which, without such reserved power, the state could not affect.  *State* v. *Noyes,* 47 Maine, 189.  This charter, however, was passed in 1846, and at that time there was in existence a general law, (Gen. Statutes, p. 278, secs. 3 and 4,) which provided that all charters thereafter passed should be subject to amendment, unless it was otherwise *expressly* provided in them, *but,* that no such amendment should become operative, against the will of the company, unless the amendment itself should *specially provide otherwise.*   It has been held by the Supreme Court of the United States, and by other courts, that all charters passed during the existence of a general law of this kind, are to be construed exactly as if this general law was *repeated verbatim in each charter,* and this power to amend became a constituent part of the contract created by the charter, and

of each part of it, so that each and every contract so made was in law considered as including within itself an agreement that the state might end it at its pleasure.  As, for instance, where the charter granted an exemption from taxation, but was passed under a general law of this kind, the legislature could repeal that exemption, as having this implied power to rescind impliedly annexed.  So in *Tomlinson* v. *Jessup*, 15 Wall., 457, the court say, in just such a case: "The provisions of that law, therefore, constituted the condition upon which every charter of a corporation subsequently granted was held, and upon which every amendment or modification was made.  They were as operative and as much a part of the charter or amendment *as if incorporated with it.*"  And in *Walker* v. *Whitehead*, 16 Wall., 317, the court say: "The laws which exist at the time and place of the making of the contract, and where it is to be performed, *enter into and form a part of it.*  This embraces alike those which affect the validity, construction, discharge, and enforcement."  When this charter, therefore, was passed, it constituted a contract with the respondents that their charter should not be amended without their assent, unless the act amending it *specially provided otherwise*, and any attempt to amend it in any other way was clearly a violation of that contract, and void.  This act, moreover, was in existence when the act of 1875 in question was passed, and has never been repealed.  We come then to the conclusion that the charter *may* be amended, but that such amendment shall *not be operative* until accepted by the respondents, unless the amendatory act itself *specially* provides that such assent shall not be necessary.  And the question arises, what is the effect, of the word "specially."  It evidently has the same effect as the word "expressly" in the preceding section.  Each provides for an exception to the general rule, and in each case such exception is to be made in the same way; all charters are to be amendable, unless it is expressly stated that they shall not be, and none are to be so amended without the assent of the corporation, unless it is specially stated that they shall be.  The meaning of these words cannot be mistaken; it is, that in neither case shall

there be an *implied* exception, one by *construction.* If the legislature does not make it in terms, it does not in either case intend to leave it to the courts to say whether from the whole act they think it meant to except. If any less effect than this is given to these words, it renders them altogether useless and unnecessary, for, in either case, saying only "unless otherwise provided," would be all that was needed, and would open the way for the courts to say in each case whether it was otherwise provided, directly or indirectly. But this would be directly contrary to the settled rule of construction, which is, that in statutes, as in all other instruments, its due weight and effect is to be given to each word used. Sedgwick on Stat. & Const. Law, 201. " It is moreover an established rule that statutes are to be so construed that every word in them is, if possible, to take effect; such being according to the presumed intent of the legislature." *Cadwell* v. *The State,* 17 Conn., 472. It is also as well settled a rule that its usual common and appropriate meaning shall be given to every word in a statute. *Higley* v. *Bunce,* 10 Conn., 441. Now a special or express direction to do a particular thing is where such thing is specifically mentioned, in distinction from a general direction, where the precise thing is not mentioned, but expressions are used which, by implication or construction, include it. Webster defines "express" as "given in direct terms, not implied or left to inference, as an express agreement," and defines "specially," as meaning "particularly." The definitions in the decisions are to the same effect. In *Tomlinson* v. *Jessup,* 15 Wall., 457, before cited, the expression was "unless excepted in express terms," and it was decided that as there was no *clause* excepting the amendment from the general law, no exception could be implied, though the act said that the stock and property of the company "is hereby exempted from all taxation during the continuance of the present charter of the company." Could there be anything nearer an express exemption than this, if any implication whatever is to be allowed? No other reason can be given for using these words; they either mean what we claim, or they mean nothing and are entirely useless, for

every other object would have been as fully obtained by merely saying "unless otherwise provided;" then and then only the question would arise in each case, whether from the whole spirit of the act, and the general expressions used, the court could imply that it was intended to make acceptance unnecessary, but by inserting these words such implication is excluded, and as it is admitted that there is no such special exception in this case, and that the amendment has not been accepted, but has been rejected, the necessary inference is that the act has never yet become operative.

2.   But if this act be held to be an amendment to the charter, we claim it is void, because it is a violation of a contract existing between the State and the company.   It is not necessary to fix a definite limit to the power of the legislature in amending charters, but it is certainly true that no court has ever held that where the State has, outside of the charter, made a valid contract with a corporation, it can impair that contract under the guise of amending its charter.   *Zabriskie v. Hackensack & N. York R. R. Co.*, 18 N. Jersey Eq. R., 192.   The most advanced decisions on this subject are *Tomlinson v. Jessup*, 15 Wall., already cited, and *Holyoke Co. v. Lyman*, 15 Wall., 500.   In both of these cases it was claimed that the provisions in the charters of corporations were such, that in and by them a contract existed with the State, which it could not impair; but the court decided otherwise, on the sole ground that the right to impair was as much in the charter as if added to each contract in express terms. And legally speaking there was no absolute contract, but only an exemption terminable at the pleasure of the State; and in both of them it is said that this power to amend cannot affect any vested rights of the corporation.   Any contract between the State and a corporation made otherwise than in and by the charter, is not affected by the power to alter the contracts made in the charter.   Suppose this company had applied to the legislature itself for a release from the duty of keeping up these stations, and the legislature had granted their prayer upon condition that they would pay into the state treasury the sum of ten thousand dollars, and the

respondents had paid this money; could the legislature the next week enact that the respondents should thereafter re-establish those stations which had been so abandoned? We say, most assuredly, that it could nqt. But the investing ten thousand dollars in building the station is in law as valid a consideration as paying it to the State would be. The only question therefore is, was the right given by the commissioners equivalent to one given by the legislature itself. By a general law the legislature directed that no station could be abandoned without the consent of the commissioners. This was equivalent to a provision that stations could be abandoned with their consent, thereby delegating to them as its agents the power theretofore existing in the legislature itself on that subject, and a grant by them was a grant by the legislature. *State* v. *N. Haven & Northampton Co.*, 37 Conn., 164. These commissioners, in due form of law, after a public hearing on legal notice, authorized such abandonment and substitution, upon the erection by the company of a new station house of a certain character, which the company did erect at great expense, and it was approved by the commissioners, and this court has held that these acts of the commissioners were proper and legal. This proceeding was entirely outside of the charter of the company, and was as much a separate matter as a grant of land by the State to the company would be. It presents the case of an application by the company for a certain right, a delegation by the legislature of the power to grant such right, and an absolute grant by the agent for a consideration deemed sufficient. *The Binghamton Bridge*, 3 Wall., 74. It is clear that the application and grant were for a *permanent* right to abandon. It is absurd to suppose that the company asked for, or the commissioners granted, a right to abandon which could be revoked the next day. In *Home of the Friendless* v. *Rouse*, 8 Wall., 437, it was held that a provision that the property of a corporation " should be exempt from taxation," meant that it should be forever exempt. The court say, " To add the word ' forever ' after the word ' taxation ' could not make the meaning any clearer. It was undoubtedly the purpose

of the legislature to grant to the corporation a valuable franchise, and it is easy to see that the franchise would be comparatively of little value if the legislature, without taking any direct action on the subject, could at its will resume the power of taxation." It will hardly be claimed that the legislature has not the power of acting through agents in relation to special matters. If it authorizes the state treasurer to make a contract on behalf of the State, is it not as valid as if made by an act of the legislature itself? In *Bradley* v. *N. York & N. Haven R. R. Co.*, 21 Conn., 305, the court, in speaking of the power of eminent domain, and the delegation of such power, say: "The defendants in that case would have acted merely as the constituted agents or instrumentality of the legislature, which would itself have been only the representative or instrumentality, so to speak, of the people or sovereign power of the State, and, within the scope of the authority conferred by the law under which they thus acted, *would be invested with all the rights and powers of the State.*" In *Commonwealth* v. *Essex Company*, 13 Gray, 239, it was provided in the defendants' charter that they should build fish-ways on their dam " in the manner provided by the county commissioners," which they did, and the court say, on page 250: " We believe it has been usual in such acts of legislation to *delegate an authority* to a committee or commissioners to see that certain provisions are specifically carried into effect, *and we have never known the legality of such delegation of power questioned.*" In *Waterbury* v. *Hartford, Providence & Fishkill R. R. Co.*, 27 Conn., 154, the court say, in speaking of the location of a railroad track: " The mile of the old highway taken, became, as is agreed, a part of the established railroad track, *and this was done by the legislature itself, for it was done by the commissioners who represented the legislature.*" It appears, then, that the acts of the railroad commissioners were, in relation to matters within their authority, the acts of the legislature; that they have, for a good consideration, granted to the respondents a right to permanently abandon the station in question, and therefore the act of 1875, purporting to revoke that grant

and obliging them to resume the use of the station at Plants-ville, is void. The case of *Commonwealth* v. *Essex Co.*, 13 Gray, 239, is directly in point. The State gave a charter to the company to erect a dam, and provided that it should build fish-ways in the mode prescribed by the county com-missioners, upon due notice and a public hearing. The hear-ing was had, and a mode prescribed, which was complied with. By an amendment it was provided that the company should pay all damages to the owners of fish-rights existing above the dam, and the company paid large sums as such compensation. Finally the legislature, by another act, pro-vided that the company should build another fish-way in the dam. During all this time a general law existed reserving the right to amend all charters thereafter passed. The court held that the last amendment and the payment of damages under it created a contract between the parties, and vested in the company a right to have the dam remain with the existing fish-ways, and the power to amend the charter did not give power to destroy this contract right, even though in this case the power to acquire these rights was given in the charter. The court say: " Where under power in a charter rights have been acquired and become vested, no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted. It appears to us in the present case that after the government, acting in behalf of the public, and also of all those riparian owners whose fish-ways would be damnified by the defendants' dam as it was, entered into a solemn and formal contract with the defendant company to exempt them from the obligation of making and maintaining a suitable and sufficient fish-way, if such were practicable, by indemnifying all parties damnified in their several fisheries,. and the defendant company had executed their part of the contract by the payment of a large sum of money, it was not competent for the legislature, without any change of circum-stances, under their authority to amend and alter the charter of the company, to pass a law requiring them to do the acts from which by the terms of such contract they had been

exempted, and therefore that the said act was null and void."
It is not necessary for us to discuss the question whether
the legislature might not be able in some proper way to pro-
vide for a new station at Plantsville, if there had been such
a material change in the needs of the public as to require it,
for it is found that no such change has taken place. Doubt-
less, if it had, under the power of eminent domain the legis-
lature could take this right, as it could any other right of
property, by making compensation.

3. If the court, however, should be of opinion that the
amendment to the charter is operative, and that no contract
or vested right existed, then we say that this act is void, as
being an attempt by the legislature to annul and reverse a
judgment of a judicial tribunal. It will not be denied that
it is universally held that, under a constitution like ours,
where the legislative and judicial functions are placed in two
separate departments, the legislature cannot in any way affect
a judgment of a court. If a justice of the peace gives judg-
ment in a suit, whether the state or any one else is a party,
the legislature cannot by an act annul, reverse, or affect that
judgment. Sedgwick on Stat. & Const. Law, p. 139, note,
says, "Any legislation which, by changing the fundamental
relations and vested rights of the parties, attempts to reverse
the ruling of the court on a past case, is void." And on
page 141, note, "In another large class of cases it is held
that the legislature cannot disturb judgments;" citing a large
number of cases. See especially *Denny* v. *Mattoon*, 2 Allen,
361. The only question then is, was this decision of the rail-
road commissioners a judgment? The judicial power, by the
constitution, is vested in "a Supreme Court of Errors, a
Superior Court, and such inferior courts as the General
Assembly shall from time to time establish." No special form
of words is required to establish a court, but whenever the
legislature appoints any person or persons to cite parties
before them, to hear witnesses, and upon their evidence to
give a judgment upon any matter in controversy between
adverse interests, their duties are judicial. It would seem as
if this question were settled by the decision in *Chester* v.

*Conn. Valley R. R. Co.*, 41 Conn., 348. The court say: "The act proceeds upon the idea that the abandonment by a railroad corporation of a station, is a matter in which the people using it and the corporation have antagonistic interests, and that controversies will arise, and the railroad commissioners are made a *special tribunal* for the settlement thereof. This tribunal exists by force of the statute; it is not the creation of the parties; therefore it has not the power of an arbitrator, defined and limited only by the agreement of individuals. *Its duties in this respect are judicial in character.* A well defined issue is presented for its determination, not indeed by any process of pleading, but by the statute itself, speaking for the contending parties. That issue is this, shall the railroad corporation be allowed to abandon a certain station? Upon this question it is to hear testimony, after due notice; upon this testimony it is to render judgment, and this, *like all other judicial judgments*, should be definite, positive, and without conditions." Can any words express more clearly that the commissioners, thus acting, constitute an inferior court, and that their decision is a "judicial judgment." It has been held that the county commissioners, in laying out a highway, acted in a judicial capacity, and their judgment was final. *Webb* v. *Rocky Hill*, 21 Conn., 468; *Terry* v. *Waterbury*, 35 id., 533. Can there be any doubt but that the appraisers who estimate the damages for taking real estate for railroads, flowing purposes, or other similar cases, are acting in a judicial capacity, whether they are specially appointed by the legislature, or by some person whom the legislature authorizes, as a judge of the Superior Court? An appeal is now allowed from the decision of the commissioners to the Superior Court, which performs exactly the acts that the commissioners do. If the acts of that court are judicial, why are not the *same acts* judicial when done by the commissioners? And if they are not judicial in either case, how can they be performed by the Superior Court?

4. This act is also inoperative, because it is a delegation of the legislative power to individuals. The legislature does not say that there shall be a station at Plantsville, or that the

company shall stop its trains there, but that if any of the petitioners or "*others who may act with them*" shall think fit, then it shall be the duty of the company to stop its trains there. It has been held that the legislature may pass a general law to take effect upon the happening of some contingency, as for instance, a majority vote of either the people of the whole state, or some portion thereof who are to be affected by it; but it has never been held that the question whether *it shall become a law or not*, can be submitted to them, much less to an individual, or any one who may desire to decide the question. In *Barto* v. *Himrod*, 8 N. York, 483, the court say (p. 490): "The event or change of circumstances on which a law must be made to take effect, must be such as in the judgment of the legislature affects the question of the expediency of the law; an event on which the expediency of the law in the judgment of the law-makers depends. *On this question of expediency the legislature must exercise its own judgment definitively and finally.*" And on page 491 they say, that if an act depended on the certificate of the attorney-general as to its expediency in his opinion, "it cannot be pretended that the statute would become operative upon the making of the certificate in its favor. The constitution does not authorize the power of legislation to be so delegated." In some of the cases where a claim submitting the law to a popular vote has been held valid it has been on the ground that the legislature enacts the law, and finds that it is expedient and proper, and the submission is merely in effect fixing the time when the law should go into operation; but the later and better decisions throw aside this flimsy distinction, and say that the people are the real sources of power, and it cannot be improper for the legislature to submit the question of the propriety of a law to its masters, who appoint it. In the cases where the question has been submitted to the vote of a municipality which is to be affected by the law, it has been sustained on the ground that it is substantially a change in their charter, and it is proper for that reason to submit to them an alteration for their assent, if the legislature deems it proper. See Cooley on Const. Lim., 118, 119. Except in

these two cases it has always been held that the legislature cannot submit to any person or persons the question whether a law should take effect or not, and in no case has it been even suggested that the legislative power may be delegated to any individual. Whether a railroad should or should not stop its trains at a particular station, is a question of the needs of the public generally, not of that of any one person, even though he may reside in Plantsville. Of this convenience the legislature is the sole judge, and it must exercise its own judgment either by itself or its own officials appointed for that purpose.

5. It is claimed, however, that this act is valid in spite of all these objections, because it is an exercise of that power of government called " police power," but which might more properly be called the duty of the government to secure the safety and health of the governed. No doubt there is such a power, and it is unnecessary to define exactly its limits, or how far by virtue of this power the obligation of contracts may be impaired or private rights of property destroyed. Doubtless all property is held by individuals subject to the powers of eminent domain, taxation, and police. Some of these powers the legislature may part with for valuable consideration, and some possibly it cannot, but it is clear upon all the decisions that the act in question is not an exercise of any of these powers. It is well settled that the police power, whatever it be, extends only to acts which are necessary for the safety or health of the public, and whether certain acts are so necessary, is not for the legislature to determine, but for the courts. The legislature cannot, under the pretence of exercising this power, pass any laws that they think fit, and thus evade the limitations placed on them by the state or federal constitutions, and if it attempts it the courts will examine and determine in each case whether the law is or is not a proper exercise of the power. Cooley on Const. Lim., 577, says: " The limit to the exercise of the police power in these cases must be this; the regulations must have reference to the comfort, safety or welfare of society; they must not be in conflict with any of the provisions of the char-

ter, and they must not, *under pretence of regulation*, take
from the corporation any of the essential rights and privileges
which the charter confers.   In short they must be police reg-
ulations *in fact*, and not amendments of the charter in cur-
tailment of the corporate franchise.   The maxim *sic utere
tuo ut alienum non lædas*, is that which lies at the foundation
of the power; and to whatever enactment affecting the man-
agement and business of private corporations *it cannot fairly
be applied*, the power itself will not extend."   Very many
authorities are cited in support of this rule, and it is evident
from them, as from reason, that the ultimate power to say
whether, in a special case, such limit has been passed, must
reside in the courts.   The true line of demarcation in rela-
tion to acts like the one in question, is this.   Under the
police power the legislature may direct what shall be done by
railroads for the *safety* of the public, but not what shall be
done only for their *convenience*.   They may be compelled to
erect fences or cattle guards, the speed of trains may be reg-
ulated in the crossing of highways, they may be compelled
to use proper brakes, couplings or platforms, but the place
where this particular station should be established, or where
particular trains on this road should be stopped for receiving
passengers or freight, has nothing to do with the *safety* of
the passengers or of the public.   This principle is most
clearly expressed in the case of *State* v. *Noyes*, 47 Maine,
189, where in a very elaborate opinion it was held, that an
act requiring a railroad to stop its trains at an intersection
of its road with another, *merely* to make connection with,
and so accommodate the passengers of another road, was not
within the police powers of the State; and on page 215, the
court say: "It would certainly be convenient for the trav-
elers living in a country thickly settled with inhabitants, to
be able to find stations where they can take passage within
the shortest distance of each other, and have the train come
to a stand against the dwelling of every one living near the
railroad track, that he might be accommodated in taking his
passage with greater convenience to himself than if he were
obliged to take another mode to reach a station.   *No one*

*would probably contend that this should be done,* and thereby subject the proprietors to burdens against which they were protected in the act of incorporation, and which if allowed might be attended with ruinous results." Nor is there anything in the act itself which shows that the legislature intended this as an exercise of the police power. It does not say that it is; on the contrary, it is passed solely as an amendment of the charter. It is also liable to the objection that it is an act of special legislation. It is well settled that acts of the legislature must be general in their character. It is not " legislation " to say that this company shall do or not do a particular thing, any more than any other individual, unless it is done as an amendment of the charter. Cooley on Const. Lim., 391. In conclusion therefore, we submit, that to give to this act the construction claimed by the counsel for Plantsville, is to render it liable to all these objections, and to require this court, unless it overrules well settled principles of law, to declare it void; while on the other hand, the construction we claim should be given to it removes all objections either to its validity or to its fairness and justice.

CARPENTER, J. The defendants for several years past had a station for freight and passengers at Plantsville in the town of Southington. They continued to stop their trains at this station until 1874, when, by the approval of the railroad commissioners, the station was abandoned. In 1875 the legislature upon certain conditions required the defendants to stop their trains at this station. The conditions were complied with, and the defendants refusing to obey the injunction of the legislature, this proceeding is instituted for the purpose of enforcing obedience.

The writ of mandamus is resisted on several grounds, which are stated in the answer, and the answer is demurred to.

1. .It is insisted that the act of 1875 is essentially an amendment of the defendants' charter, and as such is inoperative, not having been accepted by the corporation within six months.

State of Connecticut v. New Haven & Northampton Company.

The charter itself provides, " that this act may be altered, amended or repealed, at the pleasure of the General Assembly."

The public act on which the defendants rely was passed in 1845, is now in force, and is as follows: " When any amendment or alteration of the charter of any corporation shall be made, if it be not otherwise specially provided in the resolution making such alteration or amendment, it shall not become operative unless within six months after its passage it shall be accepted at a meeting of said corporation, legally warned for that purpose, and unless an attested copy of said acceptance shall be lodged on file in the office of the secretary of this state, &c."

The resolution of 1875 is as follows: " Sec. 1. That if at any time within six months after the passage of this act, any of the petitioners and others who may act with them for that purpose, shall erect at Plantsville, contiguous to the railroad, a depot building, and convey the same with the land on which it is situated, and the land reasonably necessary for the approaches thereto by the railroad trains, to the New Haven & Northampton Company, to be used for railroad purposes, it shall thereupon become the duty of said company, and it is hereby ordered, to stop at such depot thereafter its regular passenger and freight trains passing over said railroad, for the purpose of receiving and discharging passengers and freight, &c."

The second section provides that the order may be enforced by mandamus.

One thing is apparent,—that the legislature had the power to pass the act last named, as an amendment of the charter or otherwise; and had it been expressly provided that it should be operative without acceptance by the corporation, this question could not have arisen.

Another thing is equally apparent,—that the legislature intended that the act should take effect without acceptance. That could not have been plainer or more certain if it had been expressly so provided. Indeed we should not expect the General Assembly to command a thing to be done, which

is manifestly against the will of the party who is to do it, and provide for its enforcement by writ of mandamus, and at the same time provide in terms that the command should take effect *without acceptance by the party on whom the obligation is laid.* We cannot suppose, without imputing to the legislature a manifest absurdity, that it was intended that the corporation might at its option accept or reject the legislation in question, and make it operative or inoperative accordingly.

There is no uncertainty therefore as to the intention of the legislature. The constitutional power to do the thing intended, if done in a particular manner, is not denied. But it is claimed that the legislature had no power to do it in the manner attempted, not by force of any constitutional prohibition, but by virtue of a public statute which applies to all corporations. That clause of the constitution of the United States which prohibits the states from passing any law impairing the obligation of contracts, can only apply by regarding a public statute, declaring in what manner the charters of corporations created by state authority may be amended, as a contract. If it is, then it is a contract with every corporation affected by it, and can never be repealed in respect to any such corporation without its consent. This will not be claimed, therefore we will not discuss the question further in its constitutional aspect.

Regarding the statute as it is, a mere public statute, subject to alteration and repeal like any other act, ought it to have the effect of a constitutional provision limiting the power of the legislature, and compelling it to act, if it act at all, only in the mode prescribed? We think not. It is certainly liable to repeal; and when repealed, the legislature may alter or amend any charter, which is subject to alteration and repeal, in any form of language it may choose to adopt. Until repealed it should have such effect and such only as the legislature intended that it should have. And that brings us to consider the question whether it was intended to apply to the act of 1875.

There is no difficulty in ascertaining the intention of the legislature. If that is to govern, as in most cases, there need

be no further inquiry. If the later act conflicts with the prior, we might perhaps be justified in holding that the last expression of the will of the legislature must prevail. But we are not satisfied with such a summary disposition of the question. We choose rather to look at the three acts together, relating as they all do to the subject matter now under consideration, and construe them, if possible, so as to give effect to all of them.

All legislation affecting corporations, or regulating the exercise of powers conferred on them, is, in a general sense, amendatory of their charters. It is manifest however that the act of 1845 was not intended to apply to all such legislation. All acts conferring additional powers and privileges are amendments to which the act clearly applies; as it will not be presumed that the legislature has the power, or would desire to exercise it if it had, of compelling corporations to engage in enterprises not contemplated by the original charter. The taking away of powers previously granted is also an amendment, but it may be doubted whether it was intended that that provision of the act requiring acceptance should apply to such amendments. If it does, it would seem to be in conflict with the absolute power of repeal contained in the defendants' charter, and which is found in many if not most of the charters granted by the legislature. But this question does not arise in this case and we express no opinion upon it.

There are other acts which are passed in the exercise of the police powers of the legislature. They relate chiefly to the safety, health and comfort of the public. Instances of this kind of legislation may be found in the acts requiring railroad companies to supply passengers with water; to stop their trains at draw-bridges and crossings, to run at a reduced rate of speed through cities, &c. It is not claimed that the act under consideration applies to legislation of this kind.

There are also acts of a different character, which are not strictly in the exercise of police powers, but they regulate and control the exercise of corporate franchises in such a manner as to prevent injustice and oppression and promote the general welfare of all concerned. Instances of this kind

of legislation may be found in the general statutes prescribing the powers and duties of the railroad commissioners, in the acts requiring railroad companies to fence their roads, to make cattle-guards and construct bridges, to make connections with other roads, and to check baggage, &c. Such acts may be referred to the superintending or supervisory power which the legislature ought to have and must of necessity have, over the corporate beings which it has created. The act of 1875 belongs to this class and is not strictly an amendment of the defendants' charter. In respect to all such matters it is absurd that the several railroad companies in the state may accept or reject them at pleasure, as that would practically destroy the power and exalt the creature above the creator.

A more attentive consideration of the subject matter of this controversy will illustrate this point more clearly. Prior to 1866 there seems to have been no general legislation upon the subject of establishing or abandoning stations. In that year an act was passed requiring any railroad company, in certain cases and upon certain conditions, to make new stations. By another section they were prohibited from abandoning any station which had been in existence for twelve months without the approval of the railroad commissioners. It will be perceived that in this general statute of 1866 the legislature was exercising precisely the same power with respect to all railroad companies that it attempted to exercise in the act of 1875, controlling and regulating railroad companies in establishing and abandoning stations. The former is an amendment of the charter as much as the latter; and if one is inoperative without acceptance so is the other. Any principle applying to the one applies equally well to the other. In this respect the two must stand or fall together. Now it has never been claimed to our knowledge, and it probably never occurred to the profession, that the act of 1866 was inoperative until accepted. Certainly these defendants and their counsel did not suppose so at one time, for this case shows that they invoked the action of the railroad commissioners under this very act. And when they passed upon the question of abandoning Plantsville station they were exercising

the same powers that the legislature was exercising in passing the act of 1875; the only difference being that the commissioners were exercising delegated powers, and the legislature was exercising inherent powers.    If the petitioners are right in their claim now they might have abandoned that station without regard to the commissioners or the legislature.    For these reasons we entertain no doubt that the act of 1875 was operative without acceptance by the defendants.

2.    In the second place, it is claimed that the act of 1875 impairs the obligation of a contract between the state and the defendants, arising out of the facts set forth in the answer relative to the abandonment and erection of said stations. The facts are briefly these.    In 1872, in view of having one station in lieu of the Southington and Plantsville stations, the defendants purchased a piece of land and erected thereon a freight depot.    In February, 1874, the commissioners approved of the abandonment of Plantsville station on certain conditions.    The conditions were complied with, the defendants erecting a new passenger station at an expense of about ten thousand dollars, which was completed in November, 1874, when the approval seems to have taken effect, and Plantsville station was abandoned.    We are at a loss to see how this transaction can be regarded as a contract.    The state did not become a contracting party unless through the agency of the railroad commissioners.    By a reference to the statute it will be found that their duties were very simple—to approve or disapprove of the abandonment of the station. They had no power whatever to contract in behalf of the state. They had no power to impose terms or conditions except as such conditions might operate to fix the time when the approval should take effect.    The conditions imposed no burden upon the defendants, and their performance or non-performance was a matter of indifference to the state, so long as the public were reasonably accommodated.

On the other hand it was not a matter of contract with the defendants.    They determined for themselves to abandon the station, and took the requisite steps to accomplish that end. Prior to 1866 they had the absolute power to do so; and the

law of that year simply required the approval of the commissioners. After the approval the defendants sustained the same relation to the state and the public that they did before, except that they had the privilege desired. They were not bound to exercise it nor to do any other act suggested in the decision of the commissioners. In erecting a new station and abandoning the Plantsville station they acted entirely upon their own volition. Whatever they did they did voluntarily and in their own interest, and not in the interests of the state. The erection of a new station was not the price they paid for the approval of the commissioners; on the contrary it was because the wants of the public at another station required it; and presumptively it was for their interest to do so. It is quite probable that it was constructed with reference to accommodating the people of Plantsville, as well as the people of Southington. But that does not make it a contract. It was a fact to be considered by the legislature and it doubtless was considered, as the people of Plantsville were required to erect at their own expense a station to be deeded to and owned by the defendants. Each party deliberated independently of the other. The defendants decided to abandon and asked the commissioners for their approval, which, after due deliberation, was granted. There was no subject matter in respect to which the minds of the parties met and formed a contract.

3. The third objection is that the act is void as being an attempt by the legislature to annul and reverse a judgment of a judicial tribunal.

This objection assumes that the approval of the commissioners was essentially and technically a judgment, being a final determination of the rights of all parties concerned.

We think that the commissioners were not judges, that their duties were not judicial, and that their decision was not a judgment in such a sense as to have the effect claimed for it. The commissioners are nowhere in the statute called or referred to as judges. The constitution declares that the judicial power of the state shall vest in the Supreme Court of Errors, the Superior Court, and such inferior courts as the

General Assembly shall from time to time ordain and establish. The term of office of judges of such inferior courts is, by the constitution, limited to one year; whereas railroad commissioners are appointed for three years. The constitution also requires judges to be appointed by the legislature, whereas commissioners are appointed by the governor. Manifestly therefore they are not regarded as judges by the legislature.

Their duties, except in a very limited sense, are not judicial. They may, and doubtless do, in some cases, hear evidence, weigh it, and decide; and their decisions are in writing, and perhaps recorded. To that extent, as we said in *Chester* v. *Connecticut Valley Railroad Co.*, 41 Conn., 348, their duties are "judicial in character," and their decisions in popular language are often spoken of as judgments. But it is not their duty, and they have no power, to ascertain and determine the rights and enforce the relative duties of contending parties. Their whole power, and consequently their whole duty, in respect to the matter now under consideration, was to give or withhold their assent to the proposition of the railroad company. Their duties are not to enforce rights and redress wrongs, as a court of justice, but to stand in place of the legislature between corporations and the public and supervise the exercise of corporate powers, so that no injustice may be done. The legislature might, and for a considerable period of time did, discharge these duties itself; but as railroads became more numerous and complaints more frequent, the power was wisely delegated to a convenient board that could act promptly and with advantage to all concerned. The duties of this board therefore are not judicial, but such as pertain to the administrative powers of the legislature itself. Hence it follows that decisions made by one board may be practically reversed and a different decision made by another, or even by the same board at another time; always provided that rights of persons and property are properly respected. It also follows that this board, like the legislature, may in some cases correct the errors of the past. Especially is this true of decisions refusing approvals. And if, after the

approval is once granted it may not be revoked by the power granting it, it does not follow that the legislature, the supreme power of the state, may not intervene and reverse the action of the inferior tribunal, and prevent the consummation of wrong and injustice.

As the commissioners are not judges, and their duties are not judicial, their decisions cannot be judgments in the sense in which it is now claimed.

4. It is further insisted that this act is inoperative because it is a delegation of legislative power to individuals.

This objection seems to us worthy of slight consideration. In this controversy between the people of Plantsville and the defendants, the legislature thought it expedient to grant relief to the former on condition that they, at their own expense, should erect suitable buildings for the station. Accordingly the act was so framed as to take effect only when that should be done. We see nothing objectionable in this. It was a legitimate exercise of legislative power and not a delegation of it.

Other questions are suggested by the record, but as they were not insisted on in the argument we do not deem it necessary to consider them.

We advise the Superior Court that the answer of the defendants is insufficient.

In this opinion the other judges concurred.