SOUTHERN RAILWAY COMPANY *v.* LANCASTER *et al.; et vice versa.*

The motion to dismiss the writ of error, on the ground that the Selma, Rome & Dalton Railroad Company has not been made a party plaintiff in error, is not meritorious.   If that company was a party to the action, it is apparent from the record and the assignments of error in the bill of exceptions that its proper place would be as a coplaintiff

in error; and the plaintiff in error moves in this court to make such company a coplaintiff in error, which motion can prevail without notice.

Under the consolidation agreement of August, 1866, by the Alabama & Tennessee River Railroad Company, the Georgia & Alabama Railroad Company, and the Dalton & Jacksonville Railroad Company, and the statutes of Alabama and Georgia approving and adopting it, the Selma, Rome & Dalton Railroad Company became a de jure corporation, and was legally authorized to construct and operate a railroad from Selma, Alabama, to Dalton, by way of Rome, Georgia.

Such agreement and statutes approving and adopting it did not so extinguish the constituent companies that the new company could not adopt as its own the charter with its amendments of the Alabama & Tennessee River Railroad Company, and exercise all its charter rights, powers, and privileges.

The Georgia statute, enacted December 13, 1866, approving and ratifying the consolidation agreement, was not unconstitutional as seeking to delegate legislative power to the new company by authorizing its board of directors to adopt for its name "Selma, Rome & Dalton Railroad Company," and to adopt as its charter that of the Alabama & Tennessee River Railroad Company.

The Selma, Rome & Dalton Railroad Company had lawful charter power, when it executed the first mortgage, to mortgage future-acquired property; and the lien of the first mortgage was superior to that of the second mortgage on all of the property acquired by the company after the date of the first mortgage, there being then in existence no constitutional inhibition of the enactment of a special law in any case for which provision had been made by an existing general law.

The second mortgagees are, in view of the facts of this case, estopped to deny that the Selma, Rome & Dalton Railroad Company was a de jure corporation, and that the lien of the first mortgage was a valid lien superior to that of the second mortgage.

As privies in estate of the Selma, Rome & Dalton Railroad Company the second mortgagees are estopped to deny the statements of material facts made by that company in the first mortgage.

They are also estopped to deny the recital of material facts made by the company in the second mortgage.

The second mortgagees are also estopped from foreclosing their mortgage in equity, because by the lapse of time and their laches it would be inequitable, in view of the facts of the case, to allow them to enforce the legal rights claimed by them.

Even if the right of redemption by a mortgagor, or his privies in estate, exists in this State, as to realty sold under a foreclosure in equity to which the mortgagor or his privy was not a party, the second mortgagees, under the facts of this case, on account of the lapse of time and because of their laches, are barred from exercising such alleged right.

Nos. 1122, 1123.     October 1, 1919.

Exceptions to auditor's report. Before Judge Nunnally (of the city court). Floyd superior court. July 29, 1918.

George D. Lancaster, for himself and others similarly situated who might join him in the action, brought an equitable petition in Floyd superior court, returnable to the July term, 1910, against the Selma, Rome & Dalton Railroad Company, to foreclose a trust deed or mortgage dated July 1, 1870, given to James P. Wallace as trustee, on the railroad of the Selma, Rome & Dalton Railroad Company, extending from Selma, Alabama via Rome to Dalton, Georgia, with all its appurtenances, etc., to secure an issue of six million dollars of second-mortgage bonds and the interest thereon, the foreclosure sought being upon the railroad and all property connected therewith of the Selma, Rome & Dalton Railroad Company situated in the State of Georgia. The bonds matured at the end of thirty years, with the stipulation for earlier maturity upon default in payment of interest, etc. Lancaster alleged that he was the holder and owner of sixty-two of such bonds, numbered as set forth in the petition, together with the interest coupons thereto attached, aggregating, on January 1, 1910, $311,187.08. Wallace died in 1897, and had no successor as trustee. The petition alleged, upon information and belief, that the board of directors of the Selma, Rome & Dalton Railroad Company last elected had for many years failed to hold meetings, maintain an office, or otherwise perform duties; and that if there were any directors of such company in office, their names and addresses were unknown. Service of the petition was sought to be effected by publication. On October 5, 1910, Samuel W. Winn intervened in the case, claiming to be the owner of one hundred of such bonds, numbered as set forth. He was made a party plaintiff.

On October 27, 1910, the Southern Railway Company filed its petition for leave to intervene in the case, claiming title to the railroad and all the property upon which the plaintiffs sought to foreclose, and that its title was derived by virtue of judicial sale of lines of road and property in Georgia, made on November 3, 1874, by virtue of a decree previously rendered in the same year, in Floyd superior court, in an equitable action brought by James Boorman Johnston and John A. Stewart, as trustees, to foreclose a mortgage given to them as trustees, on October 1, 1867, by the Selma, Rome & Dalton Railroad Company on all of its line of roads both in Georgia and Alabama, extending from Selma, Alabama, via Rome, Georgia, to Dalton, Georgia, to secure five million

dollars of bonds with interest thereon. The petition for interven-
tion alleged, that the commissioners appointed to make the sale,
which sale was duly confirmed, executed a deed to Cowan to all
of the property sold, and further set up that a good title was
acquired to the properties by Cowan, who, with certain associates,
reorganized the railroad properties in Georgia, incorporating them-
selves as the Georgia Southern Railroad Company, such reorganiza-
tion being under an act of the Georgia legislature, approved March
2, 1875; that subsequently the Georgia Southern Railroad Com-
pany, under a power given by such act, sold the line of road to
the East Tennessee, Virginia and Georgia Railroad Company, a
corporation of the State of Tennessee, the southern terminus of
which at the time was Dalton, Georgia; that the East Tennessee,
Virginia and Georgia Railroad Company was later sold under
foreclosure, and the purchasers thereof reorganized under the
corporate name of the East Tennessee, Virginia and Georgia Rail-
way Company, the property, including the lines of the old Selma,
Rome & Dalton Railroad Company in Georgia, having passed by
deed dated June 28, 1886, to the East Tennessee, Virginia and
Georgia Railway Company; that the last-named company became
insolvent, and all of its properties were sold under foreclosure on
July 7, 1894, and on July 14, 1894, the special master of the court
in which the foreclosure was had, and by which the sale was
decreed and ordered, conveyed all of the properties real and per-
sonal, of every kind whatsoever, to certain purchasers for the
Southern Railway Company, and in this way the Southern Rail-
way Company secured the lines of railroad of the old Selma, Rome
& Dalton Railroad Company in Georgia; that it acquired legal
title to the same, and had been in rightful and adverse possession
thereof from July 14, 1894, up to the time of filing the interven-
tion; that the Selma, Rome & Dalton Railroad Company had long
since gone out of existence; that it had neither officers nor agents
who could answer in the cause; that the proceeding begun by
Lancaster, if allowed to continue, would be in effect ex parte,
would necessarily result in default on the part of the Selma, Rome
& Dalton Railroad Company, and a decree of foreclosure would
be inevitable; that such a situation would cause incalculable in-
convenience, harassment, and damage to the Southern Railway
Company, in that its title would be clouded, securities which it

had issued upon the faith of the property would be affected, and its credit damaged; and that a decree of foreclosure and sale would, in all probability, result in the seizure of the properties and in an interference with its possession, to its manifest hurt, damage, and inconvenience.

The court, after a hearing, granted an order making the Southern Railway Company a party defendant to the action. (Plaintiffs filed exceptions pendente lite to this order, but error was not assigned thereon in the Supreme Court.) The cause was referred to Honorable Joel Branham as auditor, with instructions to hear and pass upon all questions of fact and law. The auditor made and filed a report to which Lancaster and his coplaintiffs filed exceptions. These exceptions came on to be heard before Honorable W. J. Nunnally, judge of the city court of Floyd county, who took jurisdiction by reason of the fact that the judge of the superior court held himself to be disqualified.

The Southern Railway Company made a motion to strike all the exceptions of fact and law, which motion was overruled, to which ruling that company excepted pendente lite; but the exceptions pendente lite were expressly withdrawn in the brief of counsel for that company, filed in this court.

On the hearing the court sustained in whole nearly all of the exceptions of law and of fact to the auditor's report, and several of such exceptions in part. A decree was then rendered, giving effect to the rulings and decisions made by the court; and a bill of exceptions was sued out by the Southern Railway Company. A cross-bill of exceptions by Lancaster, and by the other plaintiffs who joined him in the cause through interventions, was also sued out, basing error upon the decision of the court to the effect that the auditor correctly held that the petitioners did not have the right to redeem the mortgaged property upon the terms offered. The judge in the decree stated that there were no conflicting issues of fact to be submitted to a jury; and from an examination of what are called exceptions to the findings of fact by the auditor, it appears that practically all such findings were really in effect rulings of law rather than of fact; and moreover, the brief for Lancaster et al., filed in the Supreme Court, states that the evidence was not conflicting.

The facts as they appear in the record, and material to be here

considered, are to the following effect: The act of the legislature
of Alabama approved March 4, 1848, chartering the Alabama &
Tennessee River Railroad Company, and the amendment thereto
approved November 4, 1862, authorized that company to con-
struct and operate a line of railroad from Selma, Alabama, through
certain designated counties in the State of Alabama, to the Georgia
State line, and in the direction of Rome in the State of Georgia,
and to connect with a railroad to be constructed within the State
of Georgia from a point at or near Rome. An act of the legislature
of Alabama, approved February 20, 1866, amending the charter of
the Alabama and Tennessee River Railroad Company (Acts 1865-
66, p. 340), in the third section thereof, gave the company acting
by its board of directors the power and right to connect, unite, and
consolidate that company with any other railroad company or
companies in that State or any other State, "on such terms as
may be agreed on by and with the interested and contracting com-
panies. . . The objects of these provisions being to promote
and facilitate, as far as practicable, connections between the rail-
roads and systems of roads in this State, and the railroads and
systems of roads in adjacent States, constructed and to be con-
structed. All the rights, powers, and privileges possessed and to be
possessed by the said Alabama and Tennessee River Railroad Com-
pany, under their act of incorporation and other acts, may and
shall be extended and applicable to all railroads and railroad com-
panies which may become connected or united, or consolidated with
the road, or stock, or franchise, in whole or in part, of said Alabama
and Tennessee River Railroad Company, or any road to be con-
nected or any road to be constructed by them under the provisions
of this act, so far as said rights, powers, or privileges may be
pertinent or applicable, or can be rendered pertinent or applicable
to the company or road which may be united or consolidated with
[it] in whole or in part. All contracts or agreements which may
be made by said company with any other railroad company or com-
panies, in pursuance of the provisions of this act, and having in
view the objects and purposes of these enactments as above declared
(that in promotion of connections between the railroads of this
and any other States), shall be valid according to the terms thereof,
so far as the same shall not be contrary to law." This act provided
for the issuance of bonds by the corporation, and that "the said

company, acting by their board of directors, shall have power to create a lien or liens by mortgage, or deed or deeds of trust, in such form and with such provisions and conditions as their board of directors shall prescribe, on all the property, means, effects, and rights of every kind, or any part thereof, possessed and to be possessed by said company, which shall be valid and binding according to the tenor and effect of such deed."

The legislature of Georgia, on February 18, 1854 (Acts 1853-54, p. 438), chartered the Georgia & Alabama Railroad Company, with power to build a railroad from the city of Rome in Floyd county, Georgia, to the Alabama State line, to connect with any railroad which might be chartered and authorized to be built by the State of Alabama to the Georgia line. On February 14, 1866, an act was passed by the Georgia legislature (Acts 1865-66, p. 210), amending the charter of the Georgia & Alabama Railroad Company. In section six of this act it was provided that this corporation could consolidate its road, stock, and franchise with those of the Dalton & Jacksonville Railroad Company, a corporation of this State, and any other railroad company of Georgia or an adjacent State, to such extent and on such terms as might be agreed on by the companies entering into the agreements of consolidation. In the fourth section of this act power was given the corporation, acting through its board of directors, to issue bonds "in such form and for such amount as may be deemed necessary in providing means for the completion and equipment of a railroad authorized to be constructed by them;" and to secure such bonds by mortgages or deeds of trust "covering the railroad of said company constructed and to be constructed, including all other properties and rights possessed and to be possessed by said company," etc.

On February 18, 1854, the legislature of Georgia (Acts 1853-54, p. 420) chartered the Dalton & Gadsden Railroad Company, with power to construct and operate a railroad from or near Dalton, Georgia, along and over the most eligible route to the Alabama State line in the direction of Gadsden, Alabama, on the Coosa river. On December 15, 1859, an act was passed by the legislature of Georgia (Acts 1859, pp. 335-38), authorizing the Dalton & Gadsden Railroad Company to consolidate with any railroad company chartered by the State of Alabama, the consolidated company

to be known as the Dalton & Gadsden Railroad Company. In the same year the legislature of Georgia changed the name of the Dalton & Gadsden Railroad Company to that of the Dalton & Jacksonville Railroad Company. Acts 1859, p. 335.

By act of the.legislature of Georgia of December 19, 1860 (Acts 1860, p. 191), the Dalton & Jacksonville Railroad Company and the Georgia & Alabama Railroad Company were authorized to consolidate, and when consolidated to have all the powers, privileges, and immunities to which either of said companies were then entitled by their acts of incorporation; and the Dalton & Jacksonville Railroad Company was further authorized by that act to connect with, unite, and become consolidated with any railroad companies in the States of North Carolina, Georgia, and Alabama, as by the laws of the States of North Carolina and Alabama may be authorized to unite and be consolidated with them; and it was provided that the said companies thus consolidated should have all the rights, powers, and privileges of the said companies thus consolidating.

The act of February 22, 1866, of the legislature of Georgia (Acts 1865-66, p. 209), amending the charter of the Dalton & Jacksonville Railroad Company, provided, in the sixth section, a method by which the corporation could raise money for the construction and completing of its line. It provided that the board of directors could issue bonds and could make mortgages or deeds of trust, creating liens thereby upon the railroad "as constructed and to be constructed, and all the other property and rights possessed and to be possessed by said company, including their franchises," etc. On February 23, 1866, the legislature of Georgia further amended the charter of the Dalton & Jacksonville Railroad Company (Acts 1865-66, p. 207), and in the eighth section of this act provided for the consolidation of its stock, road, and franchise with the stock, road, and franchise of the Georgia & Alabama Railroad and any other railroad of Georgia or any adjacent State, on such terms and to such extent as might be agreed upon by the companies entering into consolidation agreements.

On August 8, 15, and 16, 1866, a tripartite consolidation agreement was entered into between the Alabama & Tennessee River Railroad Company, the Dalton & Jacksonville Railroad Company, and the Georgia & Alabama Railroad Company. The material parts of this agreement are set forth in the opinion, infra. On December

13, 1866, the legislature of Georgia passed an act approving and ratifying this consolidation agreement. This act is set out in the opinion. On February 8, 1867, the legislature of Alabama passed an act ratifying and approving the consolidation of the Dalton & Jacksonville Railroad Company, and the Georgia & Alabama Railroad Company, both of the State of Georgia, with the Alabama and Tennessee River Railroad Company, of the State of Alabama, so as to form one consolidated railroad company for the construction and use of the railroad to be constructed from Blue Mountain in the State of Alabama, and a continuation of the Alabama and Tennessee River Railroad Company, by way of Rome, to Dalton in the State of Georgia, the terms of this act of the Alabama legislature being to the same effect as that of the legislature of Georgia above referred to.

On October 1, 1867, the Selma, Rome & Dalton Railroad Company executed and delivered to James Boorman Johnston and John A. Stewart, as trustees, a mortgage on its line of railroad from Selma, Alabama, by way of Rome, Georgia, to Dalton, Georgia, together with all of the appurtenances of the road. This mortgage contained a detailed statement of the history of the creation of the Selma, Rome & Dalton Railroad Company, including the charter rights, powers, and privileges of the constituent companies, the consolidation agreement and the statutes approving and ratifying the same, and the adoption by the consolidated company of the name of "Selma, Rome & Dalton Railroad Company," as well as the adoption of the charter of the Alabama & Tennessee River Railroad Company, and other material facts referred to in the opinion. This mortgage was duly recorded.

On July 1, 1870, the Selma, Rome & Dalton Railroad Company executed and delivered to James P. Wallace, as trustee, a mortgage on all of the same property described and set forth in the first mortgage dated October 1, 1867, to secure a series of bonds executed by the Selma, Rome & Dalton Railroad Company aggregating six million dollars, due July 1, 1900, these bonds being designated on the face thereof as second-mortgage bonds. There was, both in the mortgage and in the bonds, a provision for their earlier maturity in case of default by the mortgagor in the payment of interest, taxes, etc. This mortgage contained, among others, recitals of all the material facts embodied in the first mortgage, as hereinbefore

referred to.　One of the recitals was to the effect that the Selma, Rome & Dalton Railroad Company was, at the time of the execution of the first mortgage, a corporation in and duly organized under the laws of the States of Alabama and Georgia.　Other recitals were, that the said three railroad companies were the owners of the respective portions of said Selma, Rome and Dalton Railroad Company mentioned in said second mortgage, and that said Selma, Rome and Dalton Railroad Company was the owner of the entire line of railroad constructed and to be constructed from Selma, in the State of Alabama, to Dalton, Georgia, as described in said second mortgage; that said three pre-existing railroad companies, in conformity with express power and authority conferred upon them by the States of Georgia and Alabama respectively, made and entered into an agreement whereby said three railroad companies became and were lawfully united and consolidated into one company existing and to exist and to organize under the laws of said States, and that said consolidated company did business under the name and style of the Alabama and Tennessee River Railroad Company for a certain period of time and until the adoption of the name of the Selma, Rome and Dalton Railroad Company mentioned in said second mortgage; that said consolidation agreement of said railroad companies was expressly ratified and approved by the legislatures of said States of Georgia and Alabama respectively; that said consolidated company was duly authorized and empowered to adopt the corporate name and style of the Selma, Rome and Dalton Railroad Company, and also to adopt as its charter the charter of the Alabama and Tennessee River Railroad Company, with all of its amendments and with all of the rights and powers granted to it in said charter and in the amendments thereto; that said railroad company adopted said charter and became a body corporate and politic, having and using a common seal, and as such it became and was vested with and entitled to all the rights, powers, and privileges, franchises, rights of way, and other property which had theretofore belonged to or was vested in or owned or possessed or claimed by either and each of the three above-named railroad companies; that said three railroad companies, with intent to give full power and effect to the terms of the consolidation, executed and delivered to the Selma, Rome and Dalton Railroad Company deeds or conveyances of all the railroads, franchises, rights,

lands, and property of said companies; that said Selma, Rome and Dalton Railroad Company was the owner of the entire railroad, franchises, rights of way, ties, rails, and other property appurtenant to said railroad, acquired or to be acquired for the construction and operation thereof, as described in said second mortgage; that said second mortgage was given subject to all mortgages that had been theretofore made and duly recorded by the Selma, Rome & Dalton Railroad Company, on the same property; that said railroad extended from Selma, Alabama, in a northeasterly direction, continuously through that State 172 miles, more or less, to the line of the State of Georgia, thence in the State of Georgia through the counties named therein to the town of Dalton, 63 miles, more or less, making, at the point of connection with the Western and Atlantic Railroad and the East Tennessee and Georgia Railroad, the entire line thereof 235 miles, more or less; that all rights of way and other property appurtenant to said railroad, owned and to be owned or used and acquired by the Selma, Rome and Dalton Railroad Company in and for the construction, repairs, renewals, operation, and improvement thereof, constituted a part of the Selma, Rome and Dalton Railroad Company; that the Selma, Rome and Dalton Railroad Company also owned all charter rights, privileges, and franchises then possessed, or that might thereafter be acquired by said company, appurtenant to said railroad, completed or to be completed, with all other property of every kind, either in law or in equity; that a series of six thousand bonds secured by said second mortgage was so denominated in the resolution of the board of directors authorizing the issue of the mortgage, so denominated in the deed of trust and so denominated in the face of the bonds; and that both of said mortgages covered the same property. This mortgage contained a general warranty, and it was duly recorded.

When the first mortgage was executed, the Georgia & Alabama Railroad Company held eight deeds to rights of way over designated lots of land in the State of Georgia. The Dalton & Gadsden Railroad Company, which, prior to the execution of the first mortgage, had become the Dalton & Jacksonville Railroad Company, had thirty-one conveyances to rights of way over designated lots of land in the State of Georgia, and the Dalton & Jacksonville Railroad Company at that time had two deeds to rights of way over designated lots of land in the State of Georgia. When the

second mortgage was executed, the Selma, Rome & Dalton Railroad Company held fifty-six deeds to rights of way over designated lots of land in the State of Georgia, all executed subsequently to the date of the first mortgage.

On March 1, 1873, Johnston and Stewart, as trustees under the first mortgage, brought an equitable action returnable to the July term, 1873, of Floyd superior court, against the Selma, Rome & Dalton Railroad Company, for the foreclosure of the first mortgage on the entire line of railroad from Selma, Alabama, to Dalton, Georgia, and all appurtenances, fixtures, rolling-stock, etc., of such railroad; praying for the appointment of a receiver, and the grant of an injunction. This action was consolidated with a proceeding which had been begun against the Selma, Rome & Dalton Railroad Company by Alfred Shorter, for the foreclosure of a mortgage held by him and given by the same mortgagor on the same property in Georgia. Upon the motion of the plaintiffs in both bills a receiver was appointed for the lines in Georgia. A similar bill was brought in March, 1873, by the trustees in the first mortgage against the Selma, Rome & Dalton Railroad Company, for the same purpose as the Georgia bill, in the chancery court of Dallas county, Alabama. The Alabama court having appointed a receiver, the Georgia court appointed the same person as receiver. A decree was rendered by the Alabama court as prayed for. A verdict and decree in the Georgia case were rendered, by virtue of which all the railroad lines and other property connected therewith of the Selma, Rome & Dalton Railroad Company were sold by commissioners appointed by the court in the year 1874, at which sale Cowan became the purchaser of all the properties; and a commissioners' deed was executed and delivered to him for such property on November 5, 1874. A statement as to the successorship of the Southern Railway Company to Cowan's title was shown to be as appears hereinbefore set forth in the petition of that company to intervene in the present case.

It is unnecessary to set forth in detail all of the auditor's findings of fact and of law, the exceptions thereto, and the rulings of the court thereon. It will suffice to say, in brief, that the auditor's findings were, in effect, that the three consolidating companies, under their respective charters, were authorized to lay out, construct, and operate their respective lines of railroad as designated,

and to connect and consolidate with any other railroad corporation
or corporations in the States of Alabama and Georgia; that each
of such companies had power to mortgage future-acquired prop-
erty to be used in connection with the construction and operation
of its railroad; that the consolidation agreement executed by the
three railroad companies was duly and legally made by them under
their respective charters, and such agreement was duly and legally
approved and ratified by the legislatures of Georgia and Alabama;
that under such legislative authority the name of the Selma, Rome
& Dalton Railroad Company, and the charter of the Alabama and
Tennessee River Railroad Company were duly and legally adopted
as the name and charter of the consolidated company; that the
consolidated company—the Selma, Rome & Dalton Railroad Com-
pany—had legal authority to mortgage both property owned or
possessed by it, or to which it had the right of possession, and also
future-acquired property, for the purpose of constructing and oper-
ating its lines of railroad; that the first mortgage legally created
a lien on all the line of railroad from Selma, Alabama, by way of
Rome, to Dalton, and all its appurtenances, fixtures, etc., as set out
in that mortgage; that the first and second mortgages covered the
same property; that the mortgagees in the second mortgage had
both constructive and actual notice of the first mortgage, and there-
fore of all of its recitals, and were estopped to deny the recitals
both in the first and in the second mortgage, they being practically
the same; that they were also estopped by their laches to foreclose
the second mortgage; that the second mortgage could not be fore-
closed against the property therein described, and therefore that
the holders of the bonds secured by the second mortgage did not
have the right to redeem the property at Cowan's bid, with interest
thereon.

The court, in effect, sustained the exceptions to all such findings
of the auditor, except as to the right of the petitioners to redeem
the property at Cowan's bid, with interest thereon at seven per cent.,
less the earnings of the property. The court decreed that the re-
spective plaintiffs, the second mortgagees, are entitled to recover
stated amounts of principal and interest; and that the Southern
Railway Company pay into court $172,000 principal, and $1,575,-
532.60 interest, and all future interest at 7 per cent., within three
months from the date of the decree, and that it pay all court costs;

and upon failure to pay as directed, the second mortgage is fore-closed, and all equity of redemption of the Southern Railway Company is barred as to all the Georgia end of the railroad, real estate, and improvements thereon acquired by the Selma, Rome & Dalton Railroad Company subsequently to the execution of the first mortgage; that the clerk of the court make the sale at public outcry; that the plaintiffs have no right to redeem so much of the property as was held by the Selma, Rome & Dalton Railroad Company at the date of the execution of the first mortgage; that the second mortgage is a first lien on all the property ordered to be sold; that if the Southern Railway Company pay into court, as ordered, the sums of money designated, then the case will be held open for future direction and decree. The Southern Railway Company filed exceptions to all the findings of the court made against it; and the plaintiffs filed a cross-bill of exceptions, assigning error upon the ruling of the court that they did not have the right to redeem upon the terms offered.

*L. E. Jeffries, Maddox, McCamy & Shumate,* and *McDaniel & Black,* for Southern Railway Company.

*Dean & Dean, Maddox & Doyal, R. A. Denny, Louie Marshall,* and *G. H. Aubrey,* contra.

FISH, C. J. (After stating the foregoing facts.) The defendants in error move in this court to dismiss the main bill of exceptions, on the ground that the Selma, Rome & Dalton Railroad Company is not made a party to the bill of exceptions, citing the rule that when one of two or more defendants against whom a decree has been rendered brings a writ of error to reverse it, it is necessary for him to join his codefendants as plaintiffs in error. The motion is not meritorious. While this case was brought originally against the Selma, Rome & Dalton Railroad Company, the petition alleges that the company has no known place of business and no officer or agent in this State upon whom service could be made; and it does not appear that service was perfected upon that company. The petition for intervention on the part of the Southern Railway Company contains practically the same allegations. However, the rulings, decisions, and decree upon which error is assigned in the main bill of exceptions demonstrate that they were adverse to the Selma, Rome & Dalton Railroad Company. It follows, therefore, that even if, in the circumstances stated, the Selma, Rome & Dalton

Railroad Company could be made a party to the bill of exceptions, its proper position would be as a coplaintiff in error; and the plaintiff in error has moved to make that company such coplaintiff. This can be done without notice. See *Macon Navigation Company* v. *Schofield,* 111 *Ga.* 881 (36 S. E. 965), and cases cited; *Ramey* v. *O'Byrne,* 121 *Ga.* 516 (49 S. E. 595).

One of the contentions urged in behalf of the petitioners, Lancaster et al., whom we denominate the second mortgagees, which contention the trial judge sustained, is that the Selma, Rome & Dalton Railroad Company, the consolidated company, was never more than a de facto corporation, for the alleged reason that the consolidation of the three constituent corporations 'worked a dissolution of them all, and an extinguishment of all rights, privileges, and powers held under their respective charters; that the consolidation, if effective, created a new corporation; that none of the rights, privileges, and powers of the old corporations was transmitted to the new corporation; that the new company could exercise only such powers, etc., as were granted it by the act of consolidation, and that the powers, etc., which it undertook to exercise, and which are contested in this case by the second mortgagees, were never legally conferred upon the new company. Another reason advanced in support of the contention that the consolidated company was a mere de facto corporation is that the act of the General Assembly of Georgia, approved December 13, 1866, purporting to authorize the consolidation of the three constituent corporations, was unconstitutional and void, on the ground that it was an attempt to delegate a legislative power to the board of directors of the consolidated company to adopt for it the name of "Selma, Rome & Dalton Railroad Company;" and further, to adopt as its charter the charter of the Alabama and Tennessee River Railroad Company, as then existing, with the amendments thereto.

Generally, the consolidation of two or more corporations operates to dissolve them, and to create a new one, and the rights, privileges, and powers of the old corporations are not transmitted, by the act of consolidation, to the new corporation. Whether the rights, privileges, and powers of one or more of the old corporations are vested in the new corporation by the consolidation depends, however, in each case upon its own peculiar facts. The very purpose of the consolidation agreement, and of the statute authorizing it,

or ratifying and adopting it, may, in a given case, be to confer upon the new corporation some or all of the rights, privileges, and powers of any one or more of the old corporations, and thus to enable it, under a new name, to exercise such rights, privileges, and powers; and whether this be true is to be determined by the terms of the agreement of consolidation, and of the statute under authority of which the consolidation is effected. See Wabash &c. Ry. Co. *v.* Ham, 114 U. S. 587, 595 (5 Sup. Ct. 1081, 29 L. ed. 235). In the case now under review it is apparent from the respective charters granted by the General Assembly of Georgia to the Georgia & Alabama Railroad Company, and to the Dalton & Jacksonville Railroad Company, and the charter granted by the General Assembly of Alabama to the Alabama and Tennessee River Railroad Company, that it was the purpose of such legislatures that the charters granted respectively by them to these companies should enable them to connect and consolidate with each other, in the interest of the public, as well as for the benefit of the companies, and to construct and to operate an interstate railroad from Selma, Alabama, by way of Rome, to Dalton, Georgia. Each of the companies was given authority in its charter by which such purpose could be consummated on such terms as might be agreed on by and with the interested and contracting companies.

In August, 1866, the three companies, in pursuance of their respective charter rights, duly executed a consolidation agreement for the purpose stated therein, "so as to complete and own and use one continuous railroad from Selma, by way of Rome, to Dalton, under the authority and control of one set of officers." Under this agreement all the rights, powers, privileges, franchises, and all the properties (real, personal, and mixed) belonging to either one and all of the contracting corporations, were declared to be the property and franchises of the consolidated company; each stockholder who had paid for his stock in any one of the contracting companies should be, to the extent of his stock, a stockholder in the consolidated company; the president and board of directors of the Alabama and Tennessee River Railroad Company should exercise full power and control over all the property of all of the contracting companies, thereby made the property of the consolidated company, until it should be given a new name by legislation, and should cause the railroad then completed from Selma to Blue Mountain, Ala-

bama, to be extended and completed from the latter place, by way of Rome, to Dalton, Georgia; and to enable them to do so they were authorized to issue bonds and to execute mortgages on any part or all of the property and franchises of all of the companies, including the road-bed and right of way from Selma to Dalton; all the debts, contracts, obligations, and liabilities of each of the contracting companies were assumed by the consolidated company; all the obligations upon, and made or assumed by, the Alabama and Tennessee River Railroad Company should be valid and binding on all the companies consolidated into one; until a common name should be lawfully given under which the franchises of each of the companies should be united; the Alabama and Tennessee River Railroad Company was to be the active and controlling corporation, though the organizations of the other companies were to be continued until the consolidated corporation should come into active and authorized being; at the next annual meeting of the stockholders of the Alabama and Tennessee River Railroad Company, each stockholder of the contracting companies should have the right to vote according to the amount of his stock; and each of the contracting companies should ask of the legislature which chartered it the enactment of a law giving one name to all of the companies consolidated under the agreement. Subsequently the legislatures of Georgia and Alabama each passed a statute in reference to such consolidation, that of Georgia in December, 1866, that of Alabama in February, 1867, both acts employing the same language, the statute of Georgia being as follows:

"An act approving the consolidation of the Dalton & Jacksonville Railroad Company, and the Georgia & Alabama Railroad Company, of the State of Georgia, with the Alabama & Tennessee River Railroad Company, of the State of Alabama, and to authorize the consolidated company to adopt a corporate name and charter, and act under the same.

"Section 1. Be it enacted, etc., That the consolidation of the Dalton & Jacksonville Railroad Company, and the Georgia and Alabama Railroad Company, of the State of Georgia, with the Alabama & Tennessee River Railroad Company, of the State of Alabama, so as to form one consolidated Railroad Company for the construction and use of a railroad to be constructed from Blue Mountain, in the State of Alabama, as a continuation of the Ala-

bama & Tennessee River Railroad Company, by way of Rome, to Dalton, in the State of Georgia, be and the same is hereby ratified and approved, and the said consolidated company, acting by its Board of Directors, shall be and it is hereby authorized and empowered to adopt the corporate name and style of the 'Selma, Rome & Dalton Railroad Company,' and to adopt as its charter the charter of the said Alabama & Tennessee River Railroad Company as now existing, with the amendments thereto, and under and by the said name and style and charter so authorized may and shall have, possess, enjoy, and exercise all its lawful rights, functions, powers, and privileges, and shall be subject to all lawful liabilities and responsibilities incurred or contracted, or to be incurred or contracted, by said consolidated company: provided, always, that nothing in this act shall be so construed as to release either of said companies from any obligation or liability incurred or contracted by them, or either of them, prior to their said consolidation." Sec. 2 repeals conflicting laws.

It is perfectly clear, therefore, in view of the terms of the consolidation agreement, and so much of the statute above quoted as expressly ratified and approved the agreement, that the new or consolidated company was vested with all the franchises and rights, privileges, and powers and all the properties of the three constituent corporations. Moreover, the latter part of the act expressly authorized the board of directors of the consolidated company to adopt the name of the Selma, Rome & Dalton Railroad Company, and also to adopt as its charter that of the Alabama & Tennessee River Railroad Company, as then existing, with the amendments thereto. However, if it should be granted, for the sake of the point, that under the terms of the consolidated agreement, and the statute ratifying and approving it, when the whole of the statute is considered, the three old companies were dissolved, it is nevertheless certain that the statute conferred upon the new or consolidated company the right and power to adopt the then existing charter of the Alabama and Tennessee River Railroad Company, with the amendments thereto, which contained all the powers, rights, and privileges of either of the other two contracting companies. Accordingly, if the statute be valid and the name and charter designated by it were adopted by the consolidated company, a new corporation with a new name and charter came into existence, becoming what

has been termed "an interstate corporation," for the ownership and management of an interstate line of railway, and entitled to the privileges and subject to the obligations imposed upon it by the laws of this State, and of the State of Alabama.    See the extensive and valuable notes of Judge Freeman in the case of Morrison *v.* American Snuff Co., 89 Am. St. R. 598, 650.

Is the Georgia statute unconstitutional, and therefore void, for the reasons assigned?    We think not.    It must be conclusively presumed that the legislatures of Georgia and Alabama, when they respectively enacted a statute ratifying and approving the consolidation agreement previously made by the three consolidating corporations, and authorizing the consolidated or new corporation to adopt as its name "Selma, Rome & Dalton Railroad Company," and to also adopt the charter, with the amendments thereto, of the Alabama & Tennessee River Railroad Company, were actually cognizant of and fully understood all the terms of such agreement, and of course the full import of the statute respectively enacted by them.    It was not essential that either the consolidation agreement so ratified and approved, or the charter with its amendments of the Alabama & Tennessee River Railroad Company, should be incorporated in the statutes approving and ratifying such agreement, and authorizing the new corporation to adopt as its own the charter of the Alabama corporation.    *Bibb County Loan Association* v. *Richards,* 21 *Ga.* 592; *Neal* v. *Todd,* 28 *Ga.* 335; *Central of Ga. Ry. Co.* v. *Georgia,* 104 *Ga.* 831 (31 S. E. 531, 42 L. R. A. 518), and cases cited on this point.

The charter of the Alabama & Tennessee River Railroad Company and the amendments thereto were fixed.    There was no uncertainty or contingency as to the powers which the consolidated corporation would take by the adoption of the Alabama & Tennessee River Railroad Company's charter, with its amendments.    The consolidated company had no authority to add to the powers granted, nor to take away from the responsibilities created by that charter.    Frequently laws are enacted by legislatures and made dependent for their operation upon future events and contingencies.    Judge Cooley in his work on Constitutional Limitations (7th ed.), 164-5, after stating that it is one of the settled maxims of constitutional law that the power conferred upon the legislature to make laws can not be delegated to any other body or authority,

says; "But it is not always essential that a legislative act should be a completed statute which must in any event take effect as law, at the time it leaves the hands of the legislative department. A statute may be *conditional,* and its taking effect may be made to depend upon some subsequent event. Affirmative legislation may in some cases be adopted, of which the parties interested are at liberty to avail themselves or not at their option. A private act of incorporation can not be forced upon the corporators; they may refuse the franchise if they so choose. [Citing Angell and Ames on Corp. § 81.] In these cases the legislative act is regarded as complete when it has passed through the constitutional formalities necessary to perfected legislation, notwithstanding its actually going into operation as law may depend upon its subsequent acceptance." Among the cases cited in the text is that of Lothrop *v.* Steadman, 42 Conn. 583, holding that it is not a delegation of legislative power to make the repeal of a charter depend upon the failure of the corporation ·to make up a deficiency which is to be ascertained and determined by a tribunal provided by the repealing act; as well as the case of State *v.* New Haven etc. Co., 43 Conn. 351, in which it is held that it is competent to make an act take effect on condition that those applying for it shall erect a station at a place named. Our own court in several cases has held that a statute can be enacted by the legislature and its operation be made contingent upon the will of bodies and persons other than the legislature; some of the cases are *Murphey* v. *Educational Board of Burke County,* 71 *Ga.* 856—provision of law for payment of school officers, not to operate in a county after grand jury shall otherwise recommend; *Haney* v. *Commissioners of Bartow County,* 91 *Ga.* 770 (18 S. E. 28)—road law to go into effect in county on recommendation of grand jury. In the case at bar the consolidated corporation was given legislative authority and power to adopt the name of "Selma, Rome & Dalton Railroad Company," and to also adopt as its charter that of the Alabama & Tennesse River Railroad Company, with the amendments thereto, etc. Accordingly, an acceptance of such charter by the new corporation was only necessary for its actual existence with all the rights, privileges, and powers embodied in the charter of the Alabama & Tennessee River Railroad Company. The legislative power conferred upon the directors of the new corporation, to adopt as its own the charter

of one of the constituent corporations, did not seek to confer upon them any legislative authority, but merely the option to adopt as its charter that of the named constituent corporations. There is evidence in the record showing that the Selma, Rome & Dalton Railroad Company, the consolidated company, after the statutes authorizing it to do so, did duly accept and adopt as its own charter the Alabama & Tennessee River Railroad Company's charter, together with the amendments thereto. The Selma, Rome and Dalton Railroad Company in its name created debts, issued bonds, and executed mortgages (including the one under which the second mortgagees seek to set up their alleged rights), and also purchased rights of way and took conveyances thereto.

The contention made by the second mortgagees, that the charter of the Alabama & Tennessee River Railroad Company, with the amendments thereto, gave that company the right to lay out, construct, and operate a railroad within certain prescribed limits only within the State of Alabama, is not meritorious, as clearly appears from the charter and amendments thereto of that company, as well as the statutes ratifying and approving the consolidation agreement. And moreover, the second mortgagees themselves dealt with the Selma, Rome & Dalton Railroad Company operating under the charter of the Alabama & Tennessee River Railroad Company, because it had no other charter, whilst it was constructing and operating the end of the railroad situated in Georgia.

Another contention made by the second mortgagees is that the first mortgage never operated as a lien upon so much of the railroad and other properties situated in Georgia not in the possession of the Selma, Rome & Dalton Railroad Company, or to which it did not have the right of possession at the time of execution of the first mortgage, but that all of such properties were covered by the lien of the second mortgage; and that the foreclosure and sale under the first mortgage did not pass the title to the property in Georgia acquired by the mortgagor between the dates of the first and second mortgages. We can not concede the soundness of this contention. The Civil Code, which went into effect on January 1, 1863, declared (§ 1956): "A mortgage in this State is only a security for a debt, and passes no title. It may embrace all property in possession, or to which the mortgagor has the right of possession at the time," etc. This was the statute law at the time of the

execution of the first and second mortgages involved in this case. The act of 1899 made a provision for mortgaging future-acquired property to secure an issue of bonds. There are a number of decesions by this court to the effect that (under the old statute) neither a corporation nor a natural person has a right to mortgage property which may be acquired after the execution of the mortgage. However, the charter of the Alabama & Tennessee River Railroad Company, including the amendments thereto, which was given by statute to the Selma, Rome & Dalton Railroad Company, and which was adopted in accordance with the statute as its own charter, expressly authorized the Alabama & Tennessee River Railroad Company to mortgage after-acquired property; and in pursuance of its charter so adopted the Selma, Rome & Dalton Railroad Company executed the first mortgage on its entire line of railroad, and all its properties situated in Georgia, including that of which it was then in possession, as well as that to which it then had the right of possession, and also that which it had legislative authority to subsequently acquire for the construction and operation of its railroad. Notwithstanding the provisions of the general law as stated in the code section just above quoted, the special statute authorizing the Selma, Rome & Dalton Railroad Company, under its adopted charter, to mortgage after-acquired property was valid. The constitution of 1865 (which was in effect at the time of the enactment of the statute authorizing the consolidation involved in this case) declared: "Laws should have a general operation, and no general law affecting private rights shall be varied in a particular case by special legislation, except with the free consent, in writing, of all persons to be affected thereby; and no person being under a legal disability to contract is capable of such free consent." Civil Code of 1868, § 4904. It will be observed that the constitution of 1865 did not contain the provision of our present constitution (1877) that "no special law shall be enacted in any case for which provision has been made by an existing general law." In *Mattox* v. *Knox,* 96 *Ga.* 403 (23 S. E. 307), it was said: "The legislature was not prohibited, before the constitution of 1877, from enacting special laws for particular localities, varying or changing a general law." To the same effect is *Burks* v. *Morgan,* 84 *Ga.* 627 (10 S. E. 1096); *Massey* v. *Bowles,* 99 *Ga.* 216 (25 S. E. 270); *Thorpe* v. *Butt,* 106 *Ga.* 52 (31 S. E. 793). We accordingly hold

that the first mortgage was a valid lien on all the property covered by it, and which the Selma, Rome & Dalton Railroad Co., the mortgagor, then owned or had in possession, or to which it then had the right of possession, and also upon that acquired subsequently to the execution of that mortgage; and that the foreclosure and sale under it passed the title to all such property.

Furthermore, aside from the rulings hereinbefore announced, and in view of the facts of the case as set forth in the statement preceding this opinion, the trustee in the second mortgage was, and the holders of the bonds secured by that mortgage are, estopped to deny that the Selma, Rome & Dalton Railroad Company was a de jure corporation, and had, under its charter, authority to execute the first mortgage on all of its railroad property, including that after acquired, situated both in Georgia and in Alabama; and they are further estopped to deny the validity of the first mortgage and the priority of its lien over that of the second mortgage as to all the property involved in the case. There was embodied in the first mortgage a statement of certain facts which the Selma, Rome & Dalton Railroad Company, the mortgagor, was estopped to deny; and the trustee in the second mortgage and the holders of the bonds secured thereby, being privies in estate of the mortgagor, are likewise estopped to deny such facts. The first mortgage gave a detailed history of the creation of the Selma, Rome & Dalton Railroad Company, denominating it as a corporation existing in and duly organized under the laws of the States of Alabama and Georgia; it set forth explicitly the respective charters of the three constituent companies, and the powers given them thereby, among them, that each of the companies had the right to connect and consolidate with the others, and that each of them had express authority to mortgage future-acquired property for the construction and operation of their designated railroads; that the three companies duly authorized so to do entered into a consolidation agreement under the terms of which each constituent company agreed to transfer all of its charter rights and powers to the consolidated company, and did so; that such agreement was approved and ratified by certain statutes of the States of Georgia and Alabama, which authorized the consolidated company to adopt the name of "Selma, Rome & Dalton Railroad Company," and also to adopt the charter of one of the constituent companies, viz., the Alabama

and Tennessee River Railroad Company; that the consolidated company, duly and regularly authorized to do so, did adopt such name and charter. This mortgage contained a general warranty clause. These facts were material as to the parties to the first mortgage. They were certainly material, at least in one view, that is, that the first mortgagees were given facts by the Selma, Rome & Dalton Railroad Company, which, in effect, constituted it a de jure corporation, with authority to mortgage all of its railroad property, including that to be after acquired, which facts were valuable not only to the first mortgagees, but to all who might desire to invest in the bonds secured by that mortgage; in other words, they tended to enhance the market value of the bonds. The mortgage was duly recorded. In Galveston Railroad Co. v. Cowdrey, 11 Wall. 459, 482 (20 L. ed. 199), it was held: The "holder of the fourth mortgage is an assignee of the railroad company [the mortgagor in all the mortgages], claiming under it, with full notice of the other mortgages. He is in privity with the company, and is bound by the estoppel." Moreover, the petition of the second mortgagee is brought against the Selma, Rome & Dalton Railroad Company, to foreclose the second mortgage given by it. The original petition alleged that the defendant "is a corporation organized and existing under and by virtue of the laws of the State of Georgia." This last allegation was, however, stricken by an amendment to the petition.

There are other reasons for holding that the second mortgagees are estopped in respect of the matters above stated. On the face of the bonds secured by the second mortgage appear these words: "Selma, Rome & Dalton Railroad Company, chartered by the States of Alabama and Georgia.—Second Mortgage Bonds." They attached to their petition, as an exhibit made a part thereof, a copy of the second mortgage which contains the same recitals of facts as stated in the first mortgage, showing in detail the various steps taken in the creation of the Selma, Rome & Dalton Railroad Company. The second mortgage itself contained the after-acquired-property clause, which fact strongly indicated that the second mortgagees understood that the mortgagor company had the charter power to execute a lien upon such property. One of the recitals in the second mortgage is as follows: "And whereas the said union and consolidation of the several railroad companies, so made as aforesaid, was expressly ratified and approved by laws duly enacted

by the said States of Alabama and Georgia, respectively, in and of which said laws the consolidated company, the party of the first part hereto, was and is duly authorized and empowered to adopt as its corporate name and style the name of the Selma, Rome & Dalton Railroad Company, and to adopt as its charter the charter of the said Alabama and Tennessee River Railroad Company, with all of its amendments, and to have, possess, exercise, and enjoy all of its rights, franchises, powers, and privileges; and whereas said consolidated company did lawfully adopt said name and the said charter." Another recital is: "And whereas the Selma, Rome & Dalton Railroad Company, the said party of the first part, is the owner of a certain railroad above mentioned, and which is hereinafter particularly described, and all the franchises, rights of way, track, ties, rails, railway, culverts, structures, rolling-stock, and all other property appertaining to said railroad and acquired or to be acquired for the construction and operation thereof as hereinafter more particularly described and set forth, subject to the lien of such mortgages thereon as have heretofore been made by said above-named corporation and duly recorded." The second mortgage, by express provision, therefore, is subject to the first mortgage, which had been given and duly recorded prior to the date of the second mortgage, as to all the property "acquired or to be acquired." Our holding that the second mortgagees, under this view of the case, are estopped from attacking the validity and the priority of the first mortgage, under the facts stated, is to our minds so conclusive as to need no citation of the numerous authorities supporting it.

We are also of the opinion that as the bondholders secured by the second mortgage have brought their action for its foreclosure in a court of equity, they are subject to an equitable bar by reason of their laches in proceeding to establish the rights claimed by them. This equitable bar, though analogized as far as possible to the statutes of limitations prevailing at law, nevertheless exists apart from and independent of such limitations. "The limitations herein provided [statutory limitations as to various actions] apply equally to all courts; and in addition to the above, courts of equity may interpose an equitable bar whenever, from the lapse of time and laches of the complainant, it would be inequitable to allow a party to enforce his legal rights." Civil Code, § 4369. Again: "Equity gives no relief to one whose long delay renders

the ascertainment of the truth difficult, though no legal limitation bars the right." Ib. § 4536. In *Wilkes* v. *Phillips,* 120 *Ga.* 728 (48 S. E. 113), it was said: "A person who is injured by fraud must be prompt in seeking redress, and he must prosecute his suit with diligence. Laches and neglect are always discountenanced. Nothing can call a court of chancery into activity but conscience, good faith, and reasonable diligence; and where these are wanting, the court is passive, and does nothing. A court of equity does not encourage stale claims, and a party may lose his right to complain of fraud by his delay." (Citing Bish. Eq. § 260.) Some of the other cases in which this court has applied the equitable bar from the lapse of time and laches of the complainant are: *DeLaigle* v. *Denham,* 65 *Ga.* 482; *Pierce* v. *Middle Georgia Land Co.,* 131 *Ga.* 99 (61 S. E. 1114); *Basch* v. *Frankenstein,* 134 *Ga.* 518 (68 S. E. 75); *Aken* v. *Bullard,* 134 *Ga.* 665 (68 S. E. 482); *James* v. *Hill,* 140 *Ga.* 739 (79 S. E. 782). In Alsop *v.* Riker, 155 U. S. 448, 459, 461 (15 Sup. Ct. 162, 39 L. ed. 218), the holder of certain construction bonds was held to be barred on account of his inaction and laches for a period of about seven years. In the opinion the court said: "The record discloses no element of fraud or concealment upon the part of the trustees or of any of them. What they did was done openly and was known or might have been known by the exercise of the slightest diligence upon the part of every one interested in the property of the old corporation. The plaintiff unquestionably knew, or could easily have ascertained, before the trustees bought the property at the foreclosure sale—at any rate, before they transferred it to the new corporation—that their purchase would be, and was, exclusively for the benefit of certificate-holders interested in the trust. Although his bonds had not then matured, he could have taken steps to prevent any transfer of the property that would impair his equitable rights in it, or instituted proper judicial proceedings, of which all would be required to take notice, to have his interest in the property adjudicated." The court then said, in effect, that the plaintiff was barred by the statute of limitations of New York, to wit, six years, but added: "But, without placing our decision upon that ground, and independently of the statute of limitations, the case is one in which a court of equity should refuse to interpose, because of laches upon the part of appellant in asserting the rights he now claims. Look-

ing at all the circumstances, particularly the nature of the property, good faith demanded that if he intended to question the right of the trustees to acquire, hold, and transfer it for the exclusive benefit of certificate-holders, he should have done so by formal proceedings, commenced within a reasonable time after he became cognizant of all the facts. The case is one peculiarly for the application of the rule that equity, in the exercise of its inherent power to do justice between parties, will, when justice demands it, refuse relief, even if the time elapsed without suit is less than that prescribed by the statute of limitations." There are many other decisions of that court to the same effect. We cite only one of them, however, that is, Waller *v.* Tex. & Pac. Ry. Co., 245 U. S. 398 (38 Sup. Ct. 142, 62 L. ed. 362), some of the facts there being quite similar to those in the present case. In the case last cited certain holders of bonds were refused relief on account of delay over ten years after their maturity, and forty years after their issue. In Scott *v.* Scott (Ala.), 80 So. 82, it was said: "As a matter of public policy, antiquated demands will not be considered by the courts, and, without regard to any statute of limitations, there must be a time beyond which human transactions will not be inquired into." See cases cited in notes to that case in 88 Central Law Journal, 161. See Walker *v.* Warner, 179 Ill. 16 (53 N. E. 594, 70 Am. St. R. 85).

In the present case the sale of the property covered by both mortgages occurred in 1874, under foreclosure proceedings instituted by the trustees in the first deed of trust or mortgage, and by Shorter. Cowan, the purchaser, and his successors went into possession of the property soon thereafter, under deeds conveying full title, including the equity of redemption, and changed the names of the railroads as successorship in ownership occurred; so that the Selma, Rome & Dalton Railroad Company practically went out of existence in name, as well as in fact. The Southern Railway Company became the purchaser of the property in July, 1894, and has since remained in continuous and open possession of the same, has spent large sums of money in improving the railroad and its appurtenances, that part of the line between Dalton and Rome becoming a part of a trunk line from Chattanooga to the Atlantic Ocean, and the line from Rome to Selma becoming a part of another trunk line. Mortgages were placed on the properties, and debts incurred on

account of them, there being no evidence that any of the owners, from Cowan down to the Southern Railway Company, had any notice that the bondholders under the second mortgage expected to make any claim, until this suit was filed. The second mortgage was executed on July 1, 1870, and the bonds secured thereby matured in 1900, although there was a condition in them for earlier maturity upon default in the payment of interest, and taxes. The present action was instituted in 1910. No reason whatever is alleged for the delay. The Selma, Rome & Dalton Railroad Company was always in default as to interest payments; and therefore, under the conditions in the bonds, the principal could have been declared due upon such default, and the second-mortgage bondholders could have instituted foreclosure proceedings even before the sale of the property under the foreclosure of the first mortgage. Yet they waited, without any excuse whatever, for about thirty-five years before instituting an action for the establishment of their claims.

There is one more question presented for decision, and that is, whether the petitioners in this case have the right to redeem the railroad properties covered by the second mortgage, and located in the State of Georgia, their counsel insisting that they have the right of redemption upon payment of the amount "as represented by the bid made by the purchaser at the foreclosure proceedings of the first mortgage, instituted in Floyd superior court, together with 7% interest thereon, from which amount there should be deducted [net?] earnings made from the property." The auditor and the trial judge both held against the claim of the petitioners to redeem; and we concur in their decision. As already stated, "A mortgage in this State is only a security for a debt, and passes no title." In *Suttles* v. *Sewell*, 105 *Ga.* 129 (31 S. E. 41), it was held: "Neither the defendant in fi. fa. nor any person representing him has a right to redeem property sold at a mortgage-foreclosure sale." And in the opinion it was said: "A mortgagor in this State can not redeem after a sale has been had under a foreclosure judgment." And it follows, of course, that his privies, such as assignees, and second mortgagees, can not do so. It does not appear either from the report published in that case, or from the record of file in this court, whether the foreclosure judgment and sale thereunder were had in a statutory proceeding to foreclose the mortgage, or in an equity suit. Why there should be any

difference in respect of the conclusiveness of the judgment of foreclosure in the two procedures is not apparent, though, in the view we take of this case, we are not required to render a decision as to that point. Nor do we decide whether the right of redemption, even where given by statute, is applicable after railroad properties in their entirety have been sold under mortgage-foreclosure proceedings. See Hammock *v.* Loan & Trust Co., 105 U. S. 77 (26 L. ed. 1111), and cases collated in 10 Roses' Notes, 260. Nor are we called upon to decide whether the petitioners who hold only 172 of the six thousand second-mortgage bonds could in any event maintain the right to redeem; nor whether they could redeem on the terms they offer. We do decide, with confidence, that if the petitioners ever had the right of redemption, they have lost it by their laches in seeking to enforce it. As we have seen, the first mortgage was given in 1867, and the second in 1870. The first mortgage was foreclosed in equity, and a decree of foreclosure rendered in 1874. A commissioners' sale under the decree, the confirmation thereof, and a deed to all the mortgaged property, were made in that year. The purchaser went immediately into possession, and he and those holding the properties under him by mesne conveyances down to the Southern Railway Company, which purchased in 1894, have all had open and continuous possession ever since. Large sums have been expended by the last-named company in betterments and improvements, and it has continuously and openly operated the railroad since its purchase. The second-mortgage bonds matured in 1900, with a provision, however, for accelerated maturity upon default in payment of interest, etc., as designated therein. The petitioners instituted their equitable petition to foreclose the second mortgage in 1910. They sought to amend it in 1914, by asserting their claim to redeem. Surely a court of equity will not aid them in the enforcement of such a stale claim; and this aside from any statute of limitations. It is needless to cite the many adjudicated cases in support of our holding. It has been said that the right to redeem and the right to foreclose are mutual and reciprocal, and that when the one is barred the other is barred.

We have already decided that these holders of the second-mortgage bonds were estopped by laches from foreclosing the second

mortgage.   It must follow that they are also estopped by laches from asserting their claim to redeem.

In view of the holdings above announced, the court erred in not enjoining the petitioners from prosecuting the action.

*Judgment reversed on the main bill of exceptions, and affirmed on the cross-bill.   All the Justices concur.*